**MONTGOMERY WARD & CO., INCORPORATED, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 80–2687.

United States Court of Appeals, Seventh Circuit.

Argued Oct. 2, 1981.

Decided Dec. 30, 1981.

As Amended Jan. 15, 1982.

---

James S. Whitehead, Chicago, Ill., for petitioner.

Marian Szapiro, N. L. R. B., Washington, D.C., for respondent.

Before SPRECHER and WOOD, Circuit Judges, and BROWN,* Senior District Judge.

HARLINGTON WOOD, Jr., Circuit Judge.

Montgomery Ward & Co., Inc. ("Wards" or the "Company") has appealed to this court for review of a Decision and Order issued by the National Labor Relations Board (the "Board") on November 4, 1980. The case arises from an attempt by the employees at a Greensburg, Pennsylvania, Montgomery Ward Credit Service Center to gain representation by the Amalgamated Food Employees Union, Local 590 (the "Union"). The Administrative Law Judge (the "ALJ") found that the Union obtained authorization cards from a majority of employees and that the Company, after receiving the Union's demand for recognition, committed numerous violations of the National Labor Relations Act in an effort to undermine the Union. He further found that a bargaining order was necessary to remedy the unfair labor practices. The NLRB affirmed the ALJ's findings.

■ The Union solicited authorization cards from employees at the Greensburg Credit Service Center beginning on July 2, 1979. The Union representative distributed cards to a number of employees to give to their fellow employees. On the afternoon of July 9, 1979, the Union representative presented a written demand for recognition as the bargaining representative of the em-

* The Honorable Wesley E. Brown, Senior District Judge of the District of Kansas, is sitting by designation.

ployees at the Greensburg Credit Service Center. On July 10, 1979, Wards acknowledged the request and informed the Union that it would not recognize it as the bargaining representative.[1]

On July 13, 1979, the Union filed a petition for an election. On the same date, the Union filed an unfair labor practice charge[2] alleging that Wards had, since July 9, 1979, restrained, coerced and interfered with employee rights. On September 10, 1979, the Union filed an amended unfair labor practice charge, which alleged a violation of section 8(a)(5) and which had the effect of blocking the election that was scheduled to be held on September 13, 1979. Subsequently, on November 1, 1979, the Union withdrew its election petition.

Following the issuance of a complaint on the basis of the Union's amended unfair labor practice charge, a hearing was held before Administrative Law Judge Maloney. He found that Wards had committed violations of section 8(a)(1) of the National Labor Relations Act. Specifically, the ALJ found that Wards' supervisors improperly discussed the Union during the pendency of the Union's election petition and that the Company granted a wage increase on July 11, 1979.[3] The ALJ also found that Wards violated section 8(a)(5) by refusing to recognize and bargain with the Union as the representative of the majority of the Greensburg employees.

The ALJ concluded that the Union represented a majority of the employees based on authorization cards procured by the Union's organizers. At the hearing, 41 cards were placed in evidence by the General Counsel. Two of the cards were not signed until July 10, the day after the Union made its recognition demand. The ALJ expressly found that it was unnecessary for him to consider the significance of those cards in determining the Union's majority status.

The ALJ also determined that Donita Pierce and Linda Ohr were employees on July 9 when the Union made its recognition demand. Pierce and Ohr were clerical employees at the Greensburg facility when the Union began its solicitation of authorization cards in early July, 1979. Pierce's last day of work was Tuesday, July 3. She had worked eight hours as scheduled on Monday, July 2, and Tuesday, July 3. She failed to show up for work as scheduled on Thursday, July 5; Friday, July 6; Monday, July 9; or at any time thereafter. As a result of her absence on July 5, she forfeited holiday pay for July 4.

Ohr's last day of work was also July 3. She had worked 6 hours on Friday, June 29; 6.8 hours on Saturday, June 30; 6.1 hours on Monday, July 2; and 4.2 hours on Tuesday, July 3. Like Pierce, Ohr forfeited her July 4 holiday pay when she failed to work on July 5. Neither woman ever contacted Wards to explain her absence.

Although the two women did not return to Wards after July 3, 1979, the ALJ reasoned that they were still employees of Wards on July 9. A Wards administrative personnel rule provided that employees who did not call in when absent would be carried on the personnel rolls for three days before

1. The Regional Labor Relations Manager at Wards explained to the Union representative, "In our opinion, your Union does not enjoy a majority status among the employees described and in any event, without proof of that allegation we could not take further action." The written demand did not claim that the Union had obtained authorizations from a majority of the employees. Lack of majority status can be a defense to the bargaining obligation. *Grismac Corp.*, 205 N.L.R.B. 1108 (1973), *enforced*, 87 L.R.R.M. 2154 (7th Cir. 1974).

2. Notwithstanding the pendency of the unfair labor practice charge, the Union entered into a Stipulation for Certification upon Consent Election Agreement with Wards that was approved by the Regional Director on August 2, 1979. The Agreement provided for an election on September 13, 1979, in a unit described as, "All full-time and regular part-time employees employed by Montgomery Ward & Co., Incorporated at its Greensburg, Pennsylvania Credit Service Center; excluding all other employees and guards, professional employees and supervisors as defined in the Act."

3. The ALJ applied a presumption that the increase was granted in order to undermine the Union's organizing effort. He found that Wards did not adequately rebut that presumption.

being officially terminated. Moreover, the ALJ rejected the Company's contention that five of the 39 cards signed prior to July 9 were invalid. Wards argued that the five employees had been misled regarding the purpose of the cards. The ALJ concluded that Wards waived its right to object to the validity of three of the cards (signed by Wunderley, Ghrist, and Corn) when it failed to object to their introduction into evidence. He further found that statements made to the remaining two employees (Falkosky and Robinson) were not such as to invalidate their cards.

Consequently, the ALJ concluded that, as of July 9, the Union had acquired 39 valid cards. The ALJ further found that the office and clerical unit consisted of 74 employees. Thus, on the basis of his findings, the ALJ concluded that the Union had 39 signed cards out of the 74 employees, more than the number needed to establish majority status.

Having found that Wards violated section 8(a)(5) of the National Labor Relations Act by refusing to recognize the Union as the representative of the majority of the employees, the ALJ granted the General Counsel's request that Wards be ordered to bargain with the Union on the basis of the authorization cards. *NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969). The ALJ relied on the granting of the wage increase as the basis for concluding that it was unlikely that a fair election could be held.

In establishing the Union as the sole bargaining representative of the Greensburg employees, the Judge gave no weight to an employee petition prepared after the wage increase. Addressed to the Union and Wards, the petition stated:

We the undersigned are employees and eligible voters of Montgomery Ward Credit Office in Greensburg, Pa. We employees are petitioning a right to an election to determine if we choose to be represented by Local Union No. 590. This petition is in no way a commitment determining anyone's individual position on a vote.

We, therefore, strongly urge that our rights be restored, and an election be agreed upon by Local Union No. 590, and Montgomery Ward Credit Management. cc: National Labor Relations Board— Pittsburgh, Pa. General Counsel of National Labor Relations Board—Washington, D.C.

The petition was signed by 47 of the 72 employees in the unit. Of the 47 employees who signed the petition, 18 had also signed union authorization cards. The petition was presented to the Union representative at a meeting called by the employees. He declined to accept the proffered petition. Copies of the petition, in addition to requests for an election, were sent to the Regional Office in Pittsburgh and the General Counsel in Washington. Nevertheless, the ALJ concluded, "[T]here is no reason to give any weight to this petition in determining the appropriateness of a bargaining order." Wards filed exceptions to portions of the ALJ's decision and recommended Order.

The Board affirmed the ALJ's decision and adopted his recommended Order, with few exceptions. The Board agreed that there were 74 employees in the unit when the Union demanded recognition on July 9. The Board joined the ALJ in not considering the significance of the two cards signed on July 10 and accepted the ALJ's finding that Pierce and Ohr were employees of the unit. Thus, the Board also concluded that the Union had at most 39 cards as of July 9.

Wards acknowledged the validity of 34 cards, but contended that the cards signed by Wunderley, Ghrist, Corn, Falkosky, and Robinson were invalid because of Union misrepresentations about the cards' purpose. The Board affirmed without discussion the ALJ's ruling with respect to the validity of the cards signed by Falkosky and Robinson. With respect to the validity of the cards signed by Wunderley, Ghrist, and Corn, the Board agreed with Wards that Administrative Law Judge Maloney had erroneously ruled that the Company's objections had been waived. Nevertheless, the Board found that the cards of Wunderley

and Ghrist were valid notwithstanding certain statements that had been made to them concerning the cards' purpose. Because this meant that at least 38 of the 39 cards were valid, a bare majority of the 74 employees, the Board found it unnecessary to pass on the validity of Corn's card. Accordingly, the Board found that by July 9, the date that the Union demanded recognition, the Union had obtained 38 valid authorization cards in a unit of 74 employees. The Board adopted the ALJ's decision concerning the bargaining order, but made no independent findings concerning the appropriateness of the order.

In seeking review, Wards does not contest the Board's findings that certain conduct of its employees violated section 8(a)(1) of the National Labor Relations Act, as amended, 29 U.S.C. § 158(a)(1). Instead, the Company contends that the Union did not possess valid authorization cards from a majority of the employees at the time it demanded recognition from Wards. Therefore, Wards argues that the Board erred and exceeded its statutory authority by issuing a bargaining order which establishes the Union as the exclusive representative of the Greensburg employees.

Specifically, Wards challenges the validity of three of the signed authorization cards. It alleges 1) that two of the employees who signed cards (Pierce and Ohr) were no longer employed with the Company on July 9, and 2) that one of the five cards (Falkosky's) was signed on the basis of representations that it would be used only by the Union for the purpose of obtaining an election. Wards also contends that the Board failed to show that the "possibility of erasing the effects of past practices and of ensuring a fair election ... by the use of traditional remedies ... is slight and that employee sentiment once expressed through cards would, on balance, be better protected

by a bargaining order." *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 614–15, 89 S.Ct. 1918, 1940, 23 L.Ed.2d 547 (1969).

The National Labor Relations Act provides that the labor organization designated by a majority of employees in an appropriate bargaining unit shall be the exclusive bargaining agent for those employees.[4] Although the most widely used method of designating a union as the bargaining representative of a group of employees is through the Board's election procedures, bargaining status may also be established through the employer's voluntary recognition after the union claims majority status. A third method of establishing union representation is through a Board-ordered recognition without an election.

In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969), the Supreme Court set forth the standards for approving bargaining orders issued by the Board to remedy unfair labor practices committed by an employer during a union campaign. Under *Gissel*, a bargaining order may issue (1) without a showing that the union at one point represented a majority of the employees, if the employer's "outrageous" and "pervasive" unfair labor practices have eliminated the possibility of holding a fair election, or (2) in "less extraordinary cases marked by less pervasive practices," if the union at one point represented a majority of the employees, the employer's unfair labor practices "have the tendency to undermine majority strength and impede the election processes," and "the possibility of erasing the effects of past practices and of ensuring a fair election ... by the use of traditional remedies though present, is slight...." In the instant case, the Board determined the Company's misconduct fell within the second standard outlined in *Gissel*.[5] Thus, before

---

4. Section 9(a) provides *inter alia*:

Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining

in respect to rates of pay, wages, hours of employment, or other conditions of employment....

5. The Supreme Court in *Gissel* made it clear that it is the Board's task to determine which of the three categories of severity embraced the employer's coercive and discriminatory con-

we can consider enforcing the bargaining order issued by the Board, it is necessary to determine whether the Union represented a majority of employees at the time it made its demand.

■ We begin by examining whether Pierce and Ohr were employees of Wards on July 9 since their votes were necessary to maintain a majority. Although the Board normally has wide discretion in supervising the election process and in resolving questions arising during the course of representation proceedings, *see, e.g., NLRB v. A.J. Tower Co.*, 329 U.S. 324, 330–31, 67 S.Ct. 324, 327–28, 91 L.Ed. 322 (1946); *National Van Lines, Inc. v. NLRB*, 273 F.2d 402, 407 (7th Cir. 1960), no particular deference is due the Board's conclusion here. In *Choc-Ola Bottlers, Inc. v. NLRB*, 478 F.2d 461 (7th Cir. 1973), this court reviewed a person's eligibility to vote in a Board election.

> [T]he question of . . . eligibility . . . is a pure question of law, dependent entirely on whether a person in [the employee's] situation can be said to be an employee within the meaning of the Act. Therefore, there is no occasion for the Board to exercise its discretion in this matter.

478 F.2d at 464. Although the Union never held an election in this case, the eligibility requirements for voting in an election are analogous to the eligibility requirements for counting signed authorization cards.

■ In the absence of special circumstances,[6] an employee is eligible to vote in an election if that employee holds a full-time position within the appropriate bargaining unit and is on the company payroll both at the end of the payroll period preceding the ordering of the election and on the date on which the election is held. *NLRB v. New England Lithographic Co.*, 589 F.2d 29 (1st Cir. 1978), R. Gorman, *Labor Law* 43 (1976). When an employee is off the job on the date of the election, however, this court

and the Board have stated that "whether one is an employee is a question to be determined by his reasonable expectation of employment within a reasonable time in the future." *Choc-Ola Bottlers, Inc. v. NLRB*, 478 F.2d 461 (7th Cir. 1973); *Lake City Foundry Co. v. NLRB*, 432 F.2d 1162 (7th Cir. 1970); *Whiting Corp. v. NLRB*, 200 F.2d 43 (7th Cir. 1952); *Western Union Telegraph Co.*, 32 N.L.R.B. 210, 215 (1941); *Massillon Aluminum Co.*, 27 N.L.R.B. 165, 168 (1940). Thus, a person who has no reasonable expectation of future employment as of the date of a union recognition demand cannot be considered to be an "employee" within the meaning of the National Labor Relations Act for purposes of determining majority status.

■ The "reasonable expectation of employment" standard includes two elements that must be satisfied before an employee's card may be counted: a subjective element—the employee's intent or expectation—and an objective element—the reasonableness of the expectation. The personnel policy at Wards, which provided that employees who did not call in when absent would be carried on the personnel rolls for three days before being terminated, relates only to the objective element or reasonableness of the expectation. Such a policy may restrict a person's "reasonable expectation" where that person in fact has some interest in returning. *See Lake City Foundry*, 432 F.2d 1162, 1170 (7th Cir. 1973). For example, in *Walter Packing Inc.*, 241 N.L.R.B. 131 (1979), the company policy was to fire employees who were absent and failed to call in sick. The employee was scheduled to work on the day of the election beginning at 6 a.m. He did not report for work, nor did he call in to explain his absence. He appeared to vote and cast a ballot. The Board concluded that he continued to be an employee until the expiration of the time allowed for an employee to call in sick (8:30 a.m.). Although the employee later ap-

---

duct. 395 U.S. at 612 n.32, 89 S.Ct. at 1939 n.32.

**6.** When other circumstances exist, such as striking, laid-off or part-time employees, the standard is modified. This is especially true when an employee is not at work on the day of the election or demand.

peared and had an expectation of continued employment, the Board considered him terminated because of the company policy.

 The policy at Wards, however, cannot create "expectations" in the case of an employee who has no intention of returning. At issue in this case is whether Ohr and Pierce expected to return to their jobs. The General Counsel and, ultimately, the Board, must show that Ohr and Pierce intended to return since they bear the burden of proving that the Union represented a majority of employees in order to sustain the imposition of the bargaining order. *See, e.g., NLRB v. West Sand and Gravel Co.,* 612 F.2d 1326 (1st Cir. 1979); *G.P.D., Inc. v. NLRB,* 406 F.2d 26 (6th Cir. 1969); *Crawford Mfg. Co. v. NLRB,* 386 F.2d 367 (4th Cir. 1967). Regardless of where the burden lay, however, we must examine the entire record and ascertain whether there was substantial evidence for the Board's finding that the Union represented a majority of the employees. *National Can Corp. v. NLRB,* 374 F.2d 796, 804 (7th Cir. 1967).

In the past, the Board has been able to meet its burden of showing employee status in cases where the employee communicated some continuing interest in his job. In *Lake City Foundry Co. v. NLRB,* 432 F.2d 1162 (7th Cir. 1970), the employee ceased work prior to the date on which the union claimed a card majority. This court, contrary to the Board, found that he should have been considered an employee as of the date of the recognition demand. The company supervisor's testimony indicated that the employee had some expectation of returning.

> Now, on Monday [Foster] didn't come in and he called me up and said his wife was in an accident or had fallen and was in the County Hospital and he was taking care of her. And he said he didn't know when he would be in, but he *would be in as soon as he could.*

432 F.2d at 1169 (emphasis in original). Neither Pierce nor Ohr ever contacted Wards to suggest that her absence was anything other than a total abandonment of her employment as of the close of business on July 3.

 An employee who is known to be absent from work because of illness or is on leave of absence is presumed to have the requisite expectation of future employment. For example, in *NLRB v. Staiman Brothers,* 466 F.2d 564 (3d Cir. 1972), the employee whose vote was disputed was hospitalized and had not returned to work at the time of the election. Nonetheless, he frequently visited the company's premises, and told the foreman that he did not know when he would return to work. In finding that the employee was eligible to vote, the court relied on the fact that the employee expressed a continuing interest in his job. Similarly, in *Elvin Salow Co.,* 209 N.L.R.B. 833 (1974), the Board reversed a finding that the employee had abandoned his employment. The employee feared retaliatory action by striking workers and made numerous telephone calls indicating he would return to work after the strike ended. *See also Trailmobile Division, Pullman, Inc. v. NLRB,* 379 F.2d 419 (5th Cir. 1967) (leave of absence); *NLRB v. Atkinson Dredging Co.,* 329 F.2d 158 (7th Cir. 1964) (temporary sick leave).

There was some evidence that Ohr might have been absent from work because of illness. The testimony indicates that she "cut her hand doing dishes or something and she had stitches" some time prior to July 3. Ohr came to work the day that she got stitches, but later called in sick. Her supervisor testified that she "would get phone calls . . . saying that Linda had a doctor's appointment and she would call," but never heard from Ohr again. The General Counsel presented no further evidence that the absence of either woman was caused by illness or by leave of absence. In fact, since Ohr had a pattern of calling Wards in the past when she was ill, the fact that she did not do so after July 3 may reasonably indicate that she had no expectation of continuing employment.

 Employees who quit or abandon their job lose their employee status because they no longer have the requisite expectation of future employment. *Whiting Corp.*

v. NLRB, 200 F.2d 43 (7th Cir. 1952); *John A. Thomas Crane & Trucking Co.*, 224 N.L.R.B. 214 (1976); *Roy Lotspeich Publishing Co.*, 204 N.L.R.B. 517 (1973); *Atlantic Coast Fisheries*, 183 N.L.R.B. 921 (1970). In *Roy Lotspeich Publishing*, an employee gave notice of resignation before the election and did not work on the day of the election. Although he was paid for the election day and technically still employed that day, he was ineligible to vote. The Board held that "when an employee quits his employment and stops working at a date prior to election day, he is not eligible to vote." *See also Walter Packing, Inc.*, 241 N.L.R.B. 131 (1979).

In *Whiting*, this court set aside a Board order requiring the company to bargain where the employee who had cast the deciding vote in the representation election had quit prior to the balloting. This court placed great weight on the fact that the employee ceased work prior to the date of the election and never returned to work thereafter. Although the General Counsel sought to sustain its burden of proof by calling the employee to testify concerning his intentions, this court found that the burden had not been met and that he had quit and lost his employee status.[7]

 Both Ohr and Pierce ceased work for unexplained reasons and never returned. The party seeking to establish a person's continuing "employee" status must present credible evidence that the employee had a reasonable expectation of employment in the future. The General Counsel did not come forward with any witness to

testify, or any documentary evidence to establish that either woman expressed an interest in coming back to work after leaving on July 3. Neither woman called Wards to explain her absence or to suggest that she might return. Since the General Counsel proferred no evidence to support its contention that either of these women had a reasonable expectation of returning to work, the only conclusion is that both employees quit work as of the end of the day on July 3 with no apparent intentions ever to return.

In *Atlantic Coast Fisheries*, employee Bonaviri stopped reporting for work and did not notify the employer why he was absent, or that he was coming back. Bonaviri's explanation at trial was that he had developed an arm infection and was instructed by his physician to stay home. His testimony was not corroborated and, in fact, was contradicted by others. He made no report of injury, presented no doctor bill, and made no claim for Workmen's Compensation. When Bonaviri applied for unemployment compensation, the Massachusetts Division of Employment Security found that Bonaviri abandoned his job because he had failed to notify the employer that he was absent due to illness and had failed to notify the employer when he was able to return to work. On appeal, the Board affirmed, holding that he was not an employee eligible to vote in the representation election.

 The fact that an employee who has abandoned his job is still carried on the employer's records is not sufficient to make that person an "employee" as a matter of law.[8] If such were the case, an employer

---

7. Similarly, in *John S. Barnes Corp.*, 180 N.L.R.B. 911 (1970), an employee failed to report for work just before the Memorial Day holiday. After the second day of his absence, his father called and stated that the company "could assume he was no longer an employee." Although it was not until June 3 or 4 that his termination papers were complete, he was not counted toward the majority required for the demand made on June 2. The Board found that since he left the company's employment prior to June 2 and never returned, he should not be included in the unit.

8. In *Whiting Corp.*, 200 F.2d 43 (7th Cir. 1952), this court found that the worker in question

had quit and had lost his status as an employee notwithstanding the fact that at the time of the union's demand for recognition, he was carried on the company's records as "suspended on account of illness." Similarly, the Board found that an employee was not eligible to vote in *Roy N. Lotspeich Publishing Co.*, 204 N.L.R.B. 517 (1973), even though he was still considered by his employer to be on the payroll and was paid for the election day because the Board found that he had quit two days before. Finally, in *John S. Barnes Corp.*, 180 N.L.R.B. 911 (1970), an employee who was technically on the payroll, was not included in the unit since

could easily manipulate the employee count for its own benefit. Moreover, entries in an employer's records are often no more than an administrative matter. In fact, a supervisor at Wards testified that although Pierce was terminated as of July 5, her actual paperwork was not filed until the twenty-second of August. In apparent recognition of this rule, the ALJ properly gave no weight to the fact that Wards did not remove Ohr and Pierce from the company payroll records until some time after July 9, 1979.

Furthermore, both the ALJ and the Board ignored the fact that, under the Company's policy, when Ohr and Pierce failed to appear or contact the company on July 9, they were deemed to have been terminated effective July 5, the first day of their absence. Thus, if the Wards policy has any significance, it supports the conclusion that these women cannot be found to have been employed as of July 9.

The Board also argues that it was improper to consider the fact that neither woman ever returned to her job or was ever heard from again. The Board contends that developments which occur after the demand "cannot color the picture as it stood on the critical date." *NLRB v. Jessie Jones Sausage Co.*, 309 F.2d 664, 666 (4th Cir. 1962); *NLRB v. Belcher Towing Co.*, 284 F.2d 118, 121 (5th Cir. 1960). These cases, however, may be distinguished. In *Jessie Jones*, the company experienced seasonal fluctuations in its work force and had a practice of reducing its work force during the slack season. The company discharged sixteen workers, eight of whom voted in the election. Of the eight, several had been laid off before, but had eventually been recalled to work. The critical issue was whether they had a reasonable expectation of reemployment at the time of the election. The court found that they did have such an expectation and were therefore eligible to vote. The court further held that it was irrelevant whether they were in fact even-

tually reinstated. Since the employees had a reasonable expectation of reemployment, subsequent changes in the corporation's personnel requirements which made it impractical to rehire employees did not invalidate their votes. In *Belcher*, the court held that a part-time employee was ineligible to vote because he did not share a sufficient interest in the terms and conditions of employment to warrant participation in the election of a collective-bargaining agent. Although the employee did, in fact, later become a full-time employee, such later actions did not validate his ballot.

█ In both *Jessie Jones* and *Belcher*, the status of the employee after the election was controlled by the employer. Moreover, in both, the later action did not change the employee's status at the time of the election: the employees in *Jessie Jones* still had an expectation of future employment at the time of the election and the employee in *Belcher* was still working on a part-time basis at the relevant time. In this case, however, the fact that neither Ohr nor Pierce ever returned to her job sheds light on whether either woman had any expectation of employment. Since they never returned, we can infer that they abandoned their job as of July 5 and thus were not employees on the date of the Union demand.

Moreover, there is support for the proposition that employee behavior after the relevant date may be viewed in order to shed light on the status of the worker at the time of the demand. In *Whiting*, this court noted that the employee "left at that time and never returned" and never asked for reemployment. 200 F.2d at 45. Similarly, in *John S. Barnes Corp.*, the Board found that the employee should not be included in the unit since he "left the Company's employment prior to June 2 and never returned...." 180 N.L.R.B. at 932. Finally, in *Elvin Salow Co.*, the Board found that "the very fact that [the employee] did return to work ... and continued working

the employee left the company's employment and never returned. *See also Lake City Found-*

*ry Co. v. NLRB*, 432 F.2d 1162 (7th Cir. 1970).

for the employer for a month thereafter negate[d] any abandonment intent." 209 N.L.R.B. at 834.

The authorization cards signed by Pierce and Ohr should not have been counted in determining whether the Union had the support of a majority of employees on July 9. Therefore, if Falkosky's card is valid, there were, at most, 36 valid cards in a bargaining unit of 72 employees. Since 36 cards is not a clear majority of the unit of 72 employees, it is necessary to examine the Company's contention that Falkosky signed her authorization card on the basis of a misrepresentation.[9]

■ A union may gather, from a majority of employees in a bargaining unit, authorization cards naming that union as the exclusive bargaining representative. Although cards are commonly used to make a "showing of interest" to the Board in support of a petition for a representation election, they may also be used to demonstrate majority support and thus to induce the employer to bargain without an election. In spite of the acknowledged superiority of the election process, cards may be a more reliable indicator of employee preference when employer unfair labor practices disrupt the election process and make a future fair election impossible. If the employer, however, can show that a card was gathered by misrepresentations as to the purpose of the card, the value of the card is greatly diminished.

■ Wards contends that Falkosky signed her card as a result of statements by the Union's organizers that the cards would be used for the sole purpose of obtaining a Board election. The authorization card which Falkosky signed stated:

I hereby request membership in and also authorize the Amalgamated Food Employees Union, Local 590 of the Amalgamated Meat Cutters and Butcher Workmen of North America, AFL–CIO, to represent me and bargain collectively with my employer in my behalf to negotiate and conclude all agreements concerning wages, hours, fringe benefits and other terms and conditions of employment.

The wording of the card leaves little room for ambiguity and the testimony clearly indicates that Falkosky read the authorization before signing the card.[10]

■ In *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 606, 89 S.Ct. 1918, 1936, 23 L.Ed.2d 547 (1969), the Supreme Court adopted the Board's *Cumberland Shoe* rule. *Cumberland Shoe Corp.*, 144 N.L.R.B. 1268 (1963). If the card states on its face that the signer authorizes the union to represent the employee for collective bargaining purposes, and not merely to seek an election, it will be counted unless the employer can show that the unambiguous language on the card has been "deliberately and clearly canceled by a union adherent with words calculated to direct the signer to disregard and forget the language above his signature." *Gissel*, 395 U.S. at 606, 89 S.Ct. at 1936; *Red Oaks Nursing Home, Inc. v. NLRB*, 633 F.2d 503, 507–08 (7th Cir. 1980); *Texaco, Inc. v. NLRB*, 436 F.2d 520, 523–24 (7th Cir. 1971). Thus, in *Area Disposal, Inc.*, 200 N.L.R.B. 350 (1972), the Board counted unambiguous cards where employees were told that the "principal purpose" of the cards was to obtain an election. In *Colonial Lincoln Mercury Sales, Inc.*, 197 N.L.R.B. 54 (1972), enforced, 485 F.2d 455 (5th Cir. 1973), the Board counted unambiguous authorization cards signed by employees allegedly believ-

---

**9.** It is necessary to determine whether Falkosky's card is valid since if it is invalid, there would be 35 valid cards in a unit of 72 employees. Even if the Board, at a future time, determines that Corn's card is valid (raising the number of valid cards to 36 in a unit of 72), there still would be no majority. Therefore, if Falkosky's card is invalid, there would be no reason to remand.

**10.** Of course, an employee who signs a card may not understand all the legal ramifications that may follow. But as the Supreme Court noted in *Gissel*, "We cannot agree ... that employees as a rule are too unsophisticated to be bound by what they sign unless expressly told that their act of signing represents something else." 395 U.S. at 607, 89 S.Ct. at 1939. Since Falkosky read the card, she must have been aware that she was effectuating the authorization the card declares.

ing that they were only for the purpose of obtaining a union meeting. And, in *Unarco Industries, Inc.*, 197 N.L.R.B. 489 (1972), unambiguous cards were counted where employees were told the union needed "so many more cards before they could go ahead and get an election." *See also Red Oaks Nursing Home, Inc. v. NLRB*, 633 F.2d 503 (7th Cir. 1980) (card counted where union representative stated that card was needed to "form a committee so there could be an election"); *Peerless of America v. NLRB*, 484 F.2d 1108 (7th Cir. 1973) (cards counted where employees told cards were to be used to petition for an election and that the cards would be used to show interest in the union and get a union representative to come to talk about the union).

▪ Where an employer is able to prove that authorization cards were represented as being solicited for the *sole* purpose of obtaining an election, such cards will not be valid for purposes of determining the union's majority status. *Fort Smith Outerwear v. NLRB*, 499 F.2d 223 (8th Cir. 1974). A finding of misrepresentation is not confined to situations where employees are expressly told that the "sole" or "only" purpose of the card is to obtain an election. It is not the use or nonuse of certain key or "magic" words that is controlling. The inquiry must focus on "whether or not the totality of circumstances surrounding the card solicitation is such as to add up to an

assurance to the card signer that his card will be used for no purpose other than to help get an election." *Gissel*, 395 U.S. at 608 n.27, 89 S.Ct. at 1937 n.27; *Medline Industries Inc. v. NLRB*, 593 F.2d 788, 794 n.6 (7th Cir. 1979).

▪ We find that the Board's decision to count Falkosky's card was supported by substantial evidence. The language on the card was neither canceled nor negated. Moreover, since Falkosky's testimony vacillated, it was within the ALJ's discretion to find that no misrepresentations were made to her.[11] Finally, even if Falkosky overheard statements that the cards were being used only to obtain an election, she could not remember whether "union adherents" made the statements.[12]

It appears that Falkosky's recollection of the employees' comments was based more on her impressions and assumptions than upon any specific recollections of conversations. As the Supreme Court noted in *Gissel*, "[E]mployees are more likely than not, many months after a card drive and in response to questions by company counsel, to give testimony damaging to the union, particularly where company officials have previously threatened reprisals for union activity in violation of § 8(a)(1)." 395 U.S. at 608. Moreover, we attach significance only to what the employee was told by either the solicitor or the card itself and disregard her subjective understanding.

11. Her response to the same questions fluctuated:

Q. Were you ever told that the purpose of this card was just to obtain an election?
A. No, I can't really say that[.] I was asked if I would sign the card.
Q. No one ever said to you that this card would be just used to obtain an election?
A. I don't remember my being told that, I assumed that, I thought that's what it was for.

Later, on cross-examination, she testified as follows:

Q. If I understand your testimony it was, you also heard the employees who were soliciting others to sign these cards, say that these cards would be used to obtain an election, is that correct?
A. Yes.
Q. Did you hear those employees making those statements before you signed the card?

A. Yes, I believe it was before.
Q. And did you sign the card with that understanding?
A. Yes.

In response to a question which suggested that the card solicitors said that the card would only be used to get an election, Falkosky responded, "I can't really remember whether they did. I guess that's probably what they were talking about when I heard—yes, I'd have to say yes."

12. JUDGE MALONEY: What I want to know is who was the employee or employees who stated to you, that prior to the time, you signed the card, the purpose of the card, was solely to get an election, if you remember?
A. I don't truthfully remember. I worked in a different group at that time, and it was the people that worked around me. They were talking about it, you know.

"[A]n employee's thoughts (or after-thoughts) as to why he signed a union card and what he thought that card meant cannot negative the overt action of having signed a card . . . ." *Levi Strauss & Co.*, 172 N.L.R.B. 732, 734 (1968) (quoting *Joy Silk Mills v. NLRB*, 85 N.L.R.B. 1263, enforced, 185 F.2d 732 (D.C.Cir.1950), cert. denied, 341 U.S. 914, 71 S.Ct. 734, 95 L.Ed. 1350 (1951)). In these circumstances, "to open up avenues of proof of subjective intent would create strong temptations for employers to induce employees to assert a retroactive disavowal. . . ." *Levi Strauss & Co.*, 172 N.L.R.B. at 734.

We, therefore, find that the Union had 36 valid cards in a bargaining unit of 72 employers. Since *Gissel* requires that the Union attain majority support before issuing a bargaining order, we cannot enforce the bargaining order at this time.[13] We remand the case for purposes of allowing the parties to consider any remaining cards which were not considered below. Since Wards did not contest the Board's findings that certain conduct of its employees violated Section 8(a)(1) of the National Labor Relations Act, the Board's order with respect to these violations should be enforced.

Therefore, enforcement is, in part, denied and, in part, enforced and the case is remanded for further proceedings consistent with this opinion.

---

13. Since the Union does not have majority support, we do not reach the question of whether the order should be denied enforcement because the Board did not carry out the detailed analysis mandated in *Red Oaks*, 633 F.2d 503, and did not establish that "the possibility of erasing the effects of past practices and ensuring a fair election . . . by the use of traditional remedies . . . is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order." *Gissel*, 395 U.S. at 614, 89 S.Ct. at 1940.