Andrew TOTH, et al., Plaintiffs,

v.

USX CORPORATION, and United Steelworkers of America, AFL–CIO–CLC, Defendants.

No. 88 C 2135.

United States District Court, N.D. Illinois, E.D.

Sept. 1, 1988.

Thomas H. Geoghegan, Despres, Schwartz & Geoghegan, Chicago, Ill., for plaintiffs.

Luanne Ellison, USX Corp., Law Dept., Chicago, Ill., F.A. Flowers, III, H. Graham Beene, Burr & Forman, Birmingham, Ala., S.G. Clark, Billy M. Tennant, USX Corp., Law Dept., Pittsburgh, Pa., for defendant USX Corp.

Richard M. Stanton, Jacobs, Burns, Sugarman & Orlove, Chicago, Ill., Michael Gottesman, Bredhoff & Kaiser, Washington, D.C., for defendant USWA.

## MEMORANDUM ORDER

BUA, District Judge.

Defendant USX Corporation ("USX") and Defendant United Steelworkers of America, AFL–CIO–CLC ("USWA") move this court pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss plaintiffs' complaint. For the reasons stated herein, USX and USWA's motions are granted, and plaintiffs' complaint is dismissed in its entirety.

## I.  FACTS

Plaintiffs are 15 USWA staff representatives who were active employees of USX prior to joining the union staff on a full-time basis. Each began his employment with USX 30 or more years ago and at various times prior to October 1977 left to become full-time USWA staff representa-

tives.[1] Prior to February 24, 1984, USX permitted its employees to leave USX for a period of up to two years to assume full-time work with USWA without requiring the employees to incur a break in service. While on such a leave of absence, union representatives accrue pension benefit rights as if they were working for USX. At the end of the two-year period, union representatives declining to resume employment with USX suffer a break in service which adversely affects their rights under the USX pension program.

On February 24, 1984, USX changed its leave of absence policy. Under the revised policy, USX extended the leave of absence period and permitted qualifying persons to remain on such leave until they retired from either USX or USWA. Union representatives that previously worked at a current USX steel producing facility and left prior to January 1, 1979 to assume full-time union positions servicing bargaining units with which they had been associated during their tenure with USX were eligible to apply. If selected to participate in the extended leave plan by USX, such union representatives would receive retroactive service credit as well as future service credit for the duration of their union employment. The plan revision makes clear that service credit attained under the extended leave program "shall be determined solely on the minimum formula" under the rules of governing the relevant pension plan.

Over a year after adopting the extended leave policy, USX forwarded USWA President Lynn Williams a letter announcing the change. Oddly, the letter, dated March 5, 1985, notes that six union representatives had already applied and were accepted under the revised program. Williams, however, failed to relay this information to plaintiffs or other eligible union representatives. As of February 1987, the only applicants or participants in the revised program were the six union officials to which reference is made in USX's March 5, 1985 letter.

In early 1987, plaintiffs discovered for the first time that a revised leave of absence policy existed and that they might be eligible to receive pension benefits under it. Beginning in March 1987 and continuing to the time the instant case was filed, plaintiffs submitted applications to USX for participation in the new leave of absence program. All such applications, however, were denied. By letter dated April 28, 1987, USX informed Williams that the extended leave of absence program was being terminated because recent appellate decisions indicated such long-term leave of absence plans violated § 302 of the Labor Management Relations Act. Rescission of the policy, the letter explained, was simply intended to conform USX's practice with the current status of the law. The letter indicated that although all pending applications for participation in the revised program were being denied, "leaves of absence which previously had been granted pursuant to such policy" were not being rescinded. On May 14, 1987, USX formally amended its leave of absence policy abolishing the terms of the 1984 revision. The amendment was made effective April 1, 1987.

Suffering this denial, plaintiffs approached USWA officials for help in securing benefits provided under the 1984 plan. After a series of meetings, plaintiffs were informed that USWA would not represent them in their quest for additional pension benefits from USX. Plaintiffs responded by filing the instant action.

## II. DISCUSSION

In Counts I–V of their complaint, plaintiffs assert a variety of claims under the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 141 *et seq.*, and the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, seeking monetary and equitable relief from USX. Each of plaintiffs' claims against USX is premised on the adoption or revocation of the extended leave program. In

---

1. Union records reveal that plaintiff Harry Piasecki left USX on September 24, 1977 to begin full-time employment with USWA. Piasecki was the last of the 15 plaintiffs to depart from USX to assume a full-time position as a USWA staff representative.

Count VI, plaintiffs seek damages from USWA for lost pension benefits as well as costs and fees incurred in litigating the present case. Plaintiffs' claims against the USWA are based on the theory that USWA breached its duty of fair representation by failing to promptly disclose information concerning the 1984 revisions to USX's leave of absence program and refusing to represent plaintiffs in their efforts to secure benefits thereunder.

USX moves to dismiss Counts I–V on the ground that the revised leave of absence program upon which plaintiffs' claims rest is unlawful under § 302 of the LMRA, 29 U.S.C. § 186. USWA moves to dismiss Count VI on the basis that it owes no duty of fair representation to individuals such as plaintiffs who left the bargaining unit for which USWA functions as an exclusive bargaining representative. Defendants' motions will be addressed in turn.

## A. USX's Motion to Dismiss

■ Section 302(A) of the LMRA, 29 U.S.C. § 186(a), provides in relevant part:

It shall be unlawful for any employer ... to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative of any of his employees who are employed in an industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which represents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce.

Section 302(b) of the LMRA, 29 U.S.C. § 186(b), contains reciprocal provisions prohibiting labor organizations and their officers or employees from requesting, receiving, or agreeing to receive or "accept any payment, loan, or delivery of any money or other thing of value prohibited by subsection (a)." The prohibitions contained in §§ 302(a) and (b) are aimed at preserving the integrity of the collective bargaining process by preventing employers from tampering with the loyalty of union officials and union officials from "shaking down" employers. *Arroyo v. United States*, 359

U.S. 419, 425–26, nn. 7–8, 79 S.Ct. 864, 868, nn. 7–8, 3 L.Ed.2d 915 (1959).

Section 302(c) of the LMRA, 29 U.S.C. § 186(c), contains a number of exceptions to the prohibitions outlined in §§ 302(a) and (b). One such exception, found in § 302(c)(1), reads as follows:

The provisions of this section shall not be applicable (1) in respect to any money or other thing of value payable by an employer to any of his employees whose established duties include acting openly for such employer in matters of labor relations or personnel administration or to any representative of his employees, or to any officer or employee of a labor organization, who is also an employee or former employee of such employer, as compensation for, or by reason of, his service as an employee of such employer.

It is around the foregoing exception that the central dispute between plaintiffs and USX exists. Plaintiffs, although recognizing the revised leave program entails a transfer of "money on other things of value" to union representatives in the form of increased pension payments, contend that the § 302(c)(1) exception applies to the leave policy at issue. USX asserts that it does not.

Recently, courts analyzing similar extended leave policies under § 302 have reached conflicting results. *See Trailways Lines, Inc. v. Trailways, Inc., Joint Council*, 785 F.2d 101 (3d Cir.1986), *cert. denied*, 479 U.S. 932, 107 S.Ct. 403, 93 L.Ed.2d 356 (1986); *Communications Workers of America v. Bell Atlantic Network Services, Inc.*, 670 F.Supp. 416 (D.D.C. 1987). In *Trailways*, the Third Circuit invalidated a portion of a collective bargaining agreement providing for payment of certain fringe benefits to individuals who took indefinite leaves to assume full-time union positions. The plan in *Trailways* permitted leave employees to accumulate service credit toward their company pensions as well as continue participation in the firm's group insurance plan while working as full-time union representatives. *Trailways*, 785 F.2d at 103. The parties' collective bargaining agreement specified that pen-

sion fund contributions made by the employer under the program were to be calculated on the basis of the salary being paid to the participating union representative. *Id.* at 106. After the employer discontinued pension payments under the leave plan, the union sued, arguing that the company had breached the terms of the collective bargaining agreement.

The *Trailways* court, however, rejected the union's claims and held that the payments required under the leave plan violated § 302. The court observed that according to the plain language of § 302(c)(1), payments to former employees are permissible only if they are "in compensation for, or by reason of, *his service as an employee of such employer.*" *Id.* at 105 (emphasis added). The court reasoned that a proper reading of § 302(c)(1) makes clear that the exemption for payments to former employees applies only to payments made in compensation for or reason of the former employees' *past* service to the employer. *Id.* at 106. Presumably, payments contemplated by this exception encompass pension and other benefits paid to retired employees of an employer who later assume union positions. The court ruled that the scope of permissible payments under § 302(c)(1) is limited to compensation for contemporaneous service to the employer. *Id.* Since such service could only be performed by a current employee of the employer and union representatives on leave from their company jobs cannot be viewed as current employees of the contributing employer, the court held that pension payments on behalf of former employees who assumed full-time union positions were not protected by the § 302(c)(1) exemption. In reaching this conclusion, the court observed:

> Pension fund contributions made on behalf of union officials on leave from Trailways are tantamount to direct compensation paid to its employees or payments to the union. While payments made on behalf of Union officials who were once active employees of the employer but who may never return to his employ may not at first blush be the kinds of payment thought to lead to corruption of union officials, the potential for such corruption, or at least the appearance of it, nevertheless remains.

*Id.* at 108 (citations omitted).

An opposite result under § 302(c)(1) was reached in *Communications Workers of America v. Bell Atlantic Network Services, Inc.,* 670 F.Supp. 416 (D.D.C. 1987). Like *Trailways,* the dispute focused on the terms of a leave of absence provision in a collective bargaining agreement. The leave plan in *Bell Atlantic* provided union officials on leave from their employment with the utility certain fringe benefits for a period of up to 18 years of union service. After highlighting a number of differences existing between the plan in *Trailways* and the one before it,[2] the court concluded that *Trailways* was distinguishable. *Id.* at 422–23. Under the plan at issue in *Bell Atlantic,* the court was unable to detect any possibility of bribery or extortion. However, the court believed that features in the *Trailways* plan presented a greater risk of the potential abuses § 302 was designed to prevent. *Id.* at 423.

Refusing to find *Trailways* applicable, the court turned to its own analysis of § 302(c)(1). Significance was attached to the fact that § 302(c)(1) distinguished between payments to former employees "as compensation for" their service as employees and payments made "by reason of" such services. *Id.* at 419–20. Viewing cases upholding the validity of "no-docking" provisions in collective bargaining agreements,[3] the court noted that impor-

---

**2.** The *Bell Atlantic* court noted the following differences: (1) the Trailways pension fund was jointly administered by labor and management while the Bell Atlantic plan was employer administered; (2) pension fund contributions by Trailways were based on the current salaries earned by the participating union officers where pension payments by Bell Atlantic were calculated on the salaries last received by the union representatives as a company employee; and (3) all Trailways employees accepting full-time employment with the union automatically received leaves of indefinite duration while leaves provided by Bell Atlantic could not exceed 18 years and could be denied to employees whose services were needed by the company.

**3.** In analyzing the leave program's validity under § 302(c)(1), the *Bell Atlantic* court extensive-

tant similarities existed. *Id.* at 422–23. "No-docking" provisions allow union officers who are full-time company employees to take time off from work, with pay, to conduct union business. The court observed that payments to union officials under "no-docking" provisions and payments made pursuant to extended leave programs are essentially identical in nature. *Id.* at 423. In neither case does the person perform services for the employer during the time for which compensation is furnished. *Id.* Instead, the compensated party actively engages in service for the union. *Id* The amount of time spent on union work was the only difference the court could discern between the two types of provisions. *Id.* The court emphasized that decisions sustaining the validity of "no-docking" clauses were based on the § 302(c)(1) exemption for payments made "by reason of" services provided as an employee of the employer. *Id.* Unable to find any significant distinction between the type of services afforded employers under both types of programs, the court concluded that fringe benefits provided to leave employees who assumed full-time union positions were § 302(c)(1) payments to former employees "by reason of" their past service as Bell Atlantic employees. *Id.* at 423–24.

■ Although this court agrees that little meaningful difference can be found between the nature of services provided employers in exchange for payments required under "no-docking" provisions and extended leave agreements, this court is unable to ignore § 302(c)(1)'s language requiring that the compensated individual be an actual employee of the employer. As emphasized by the Second Circuit in addressing the permissibility of "no-docking" provisions, "§ 302(c)(1) is appropriately interpreted by focusing not on whether the activities to be engaged in during the pay period directly benefit the employer but on whether they are to be engaged in by one who is a bona fide employee of the payor." *BASF Wyandotte Corp. v. Local 227, Int'l Chem. Workers Union,* 791 F.2d 1046, 1049 (2d

Cir.1986). The central distinction between "no-docking clauses" and extended leave provisions lies in the fact that payments made under the latter are made to persons who are not employees of the company providing compensation. *Trailways,* 785 F.2d at 106–07. Simply stated, the § 302(c)(1) exemption only applies to payments made to, or on behalf of, present employees of the paying company. *Id.*

In its struggle to meet this requirement, *Bell Atlantic* seems to assert that since many union representatives often return to their former jobs with the company, compensation is permissible by reason of their future service as future employees of the employer. *Bell Atlantic,* 670 F.Supp. at 423. Although ambitious, nothing in § 302(c)(1) or its legislative history supports such a construction. Rather, the plain language of § 302(c)(1) only permits payments to current employees of the employer. *BASF,* 791 F.2d at 1049; *Trailways,* 785 F.2d at 106–07. As such, this court is unable to follow the decision in *Bell Atlantic.*

Aside from the conclusions reached in *Trailways* and *BASF,* a second and perhaps more compelling reason exists for invalidating the present leave of absence plan under § 302. The leave policy, as revised in 1984, vests USX with exclusive authority to determine which union representatives will be accorded service credit toward their USX pensions. Unlike the plans at issue in *Trailways* or *Bell Atlantic,* participation in the USX extended leave program is completely discretionary. Although the 1984 leave plan sets forth specific requirements for determining applicant eligibility, USX retains absolute control over which union representatives on leave from USX will be allowed to participate in the plan.

Not only is the potential for bribery and abuse under such a plan evident, plaintiffs argue in their response briefs that the 1984 plan was adopted for the sole purpose of

---

ly reviewed the Second Circuit's decision in *BASF Wyandotte Corp. v. Local 227, Int'l Chem. Workers Union,* 791 F.2d 1046 (2d Cir.1986), and

noted the Fifth Circuit's decision in *NLRB v. BASF Wyandotte Corp.,* 798 F.2d 849 (5th Cir. 1986).

bribing certain union officials in charge of negotiating a labor agreement for a planned USX plant in Fairfield, Alabama. Plaintiffs assert that to induce union negotiators to accept substantial labor concessions in the Fairfield contract, USX proposed changing its leave of absence program to allow the negotiators to receive greater pension benefits. To ensure that the benefits were only made available to certain union officials, plaintiffs assert that the revised leave plan was not included in the Fairfield collective bargaining agreement, but instead was quietly adopted as part of a change in "corporate policy." Plaintiffs further claim that the rather unusual requirements for participation in the leave program as well as the discretionary nature of the plan existed so that only the Fairfield negotiators would receive the extended pension benefits. According to plaintiffs, this explains why six union representatives were already enrolled in the plan when USX first advised the union's president of the change in the leave policy some twelve months after its adoption. Plaintiffs assert that only after the plan was accidentally discovered by other union representatives in March 1987, triggering a wave of extended leave applications, did USX rescind its extended leave policy on the basis of a Third Circuit case decided more than a year earlier.

Although plaintiffs' assertions pose serious questions concerning potential criminal violations by certain USX and USWA personnel, plaintiffs' allegations of bribery coupled with the unbridled power of USX to pick and choose which union representatives would be accepted in the extended leave plan foreclose any possibility that the revised policy could be permissible under § 302. Not only does the plan fail to comply with § 302(c)(1)'s restriction that recipients of "things of value" be actual employees of the paying employer, the plan is allegedly designed to corrupt union negotiators. Even ignoring plaintiffs' contentions of actual bribery, the exclusive control reserved by USX to select participants from pools of eligible applicants presents an intolerable risk that the extended leave plan will be used as an instrument of cor-

ruption. Given the holding in *Trailways* and the nature of the challenged plan, this court is compelled to find that the extended leave plan adopted by USX in 1984 violates § 302 and is therefore unenforceable.

■ Plaintiffs assert that even if the leave policy violates § 302's restrictions on payments to union representatives, equity dictates that USX be required to pay pension benefits on plaintiffs' behalf as a penalty for using the leave program to bribe the Fairfield negotiators. This argument fails for two reasons. Although plaintiffs assert they are innocent third parties and are not *in pari delicto* with USX, participation in the leave program was discretionary. Even if this court were to give effect to the invalid leave provision as a "penalty" against USX, plaintiffs are unable to demonstrate they ever possessed an absolute right to participate in the program. Courts enforcing contracts deemed illegal under the theory that one side is not *in pari delicto* with the other do not rewrite the terms of the unlawful agreement to ensure that the less culpable party obtains recovery. Moreover, because members of the union employed at the Fairfield plant, rather than union representatives, would suffer any injury resulting from the alleged bribery scheme, difficulty exists in identifying the damages allegedly caused to plaintiffs.

Second, federal courts do not sit to enforce promises or agreements deemed illegal under the federal labor laws. *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 77, 102 S.Ct. 851, 856, 70 L.Ed.2d 833 (1982). In *Kaiser*, a union fund trustee sought to enforce certain terms of a collective bargaining requiring the employer to make union fund contributions which violated § 8(e) of the NLRA, 29 U.S.C. § 158(e), the "hot cargo" provision of the Act. *Id.* at 76. Reversing the circuit court's affirmance of a judgment compelling the employer to make the challenged payments the Supreme Court declared that provisions in collective bargaining agreements that violate the labor laws are unenforceable. *Id.* at 77, 86. To hold otherwise, the Court observed, would command unlawful conduct which is impermissible in the federal

courts. In coming to its holding, the Court stated as follows:

> There is no statutory code of federal contract law, but our cases leave no doubt that illegal promises will not be enforced in cases controlled by federal law.
>
> \* \* \* \* \* \*
>
> The authorities from the earliest time to the present unanimously hold that no court will lend its assistance in any way towards carrying out the terms of an illegal contract. In case any action is brought in which it is necessary to prove the illegal contract in order to maintain the action, courts will not enforce it ... To permit a recovery in this case is in substance to enforce an illegal contract ... The Court refuses to enforce such a contract and it permits defendants to set up its illegality, not out of any regard for the defendant who sets it up, but only on account of the public interest.

*Id.* at 77.

Plaintiffs do not present nor is this court able to detect any public interest which is served by enforcing the terms of the unlawful leave program. Quite to the contrary, the public interest is best served by refusing to enforce plans designed to promote corruption in the collective bargaining process. As this court is unable to accept plaintiffs' equitable arguments for recovery and the revised leave plan under which plaintiffs seek pension benefits is illegal under § 302, this court is compelled to grant USX's motion to dismiss counts I–V of plaintiffs' complaint.

### B. USWA's Motion to Dismiss

■ Plaintiffs' remaining claim in Count VI is directed solely at USWA. Plaintiffs contend that USWA breached its statutory duty to fairly represent them by failing to provide prompt notice of the revised leave plan and failing to pursue USX for benefits allegedly due plaintiffs under the revised leave plan. Plaintiffs' assertions rest on the theory that as employees on leave from USX, they remained part of the bargaining unit to which USWA owed a duty of fair representation.

The law has long been settled that a union owes a statutory duty of fair representation only to those employees for whom the union serves as exclusive representative. *Schneider Moving & Storage v. Robbins,* 466 U.S. 364, 376 n. 22, 104 S.Ct. 1844, 1851 n. 22, 80 L.Ed.2d 366 (1984); *Vaca v. Sipes,* 386 U.S. 171, 177, 180, 87 S.Ct. 903, 909, 911, 17 L.Ed.2d 842 (1967). As the Seventh Circuit observed in *Freeman v. Local Union No. 135,* 746 F.2d 1316, 1320–21 (7th Cir.1984):

> A union's statutory duty of fair representation is coextensive with its authority under § 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a), to act as the exclusive representative of the collective bargaining unit. [Citations omitted.] The scope of the duty of fair representation, however, extends no further. If a union does not serve as the exclusive agent for the members of the bargaining unit with respect to a particular matter, there is no corresponding duty of fair representation.

Thus, the very logic on which the duty of fair representation is based establishes its limiting principle: a duty is only owed to those for whom a union acts as the exclusive bargaining representative, and even then only as to matters which fall within the union's exclusive control. If persons are free to pursue their interests on their own, *i.e.,* are not subordinated to the union's exclusive control, "the rationale for the duty of fair representation evaporate[s]," and the union owes them no duty of fair representation. *Freeman,* 746 F.2d at 1321.

Retired employees lose their status as bargaining unit members and are outside the union's exclusive representation authority. *Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass,* 404 U.S. 157, 180 n. 20, 92 S.Ct. 383, 398 n. 20, 30 L.Ed.2d 341 (1971). As such, the union is under no statutory duty to represent them. *Id.; Central States Pension Fund v. Central Transport,* 472 U.S. 559, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985).

Similarly, union employees assuming supervisory positions depart from the bar-

gaining unit represented by the union and are no longer owed a duty of fair representation. *Merk v. Jewel Food Stores,* 848 F.2d 761, 128 LRRM 2608 (7th Cir.1988); *McTighe v. Mechanics Educ. Society,* 772 F.2d 210 (6th Cir.1985); *Cooper v. General Motors Corp.,* 651 F.2d 249 (5th Cir.1981). As noted by the Seventh Circuit in *Merk:* "The Union owes no duty to those it does not represent. If it does not have a duty to represent them at all, it does not have a duty to represent them 'fairly.'" *Merk,* 848 F.2d at 766, 128 LRRM at 2612–13.

USWA argues that application of the foregoing authority conclusively establishes that no duty of fair representation was owed plaintiffs. The union notes that under the plan existing at the time each plaintiff left USX to become USWA representatives, leaves of up to two years were permitted for full-time union work. Failure to return to USX before expiration of the two-year period resulted in a break in service. Under this system, the last plaintiff to leave USX broke service in early October 1979. USWA thus contends that almost four and a half years before the revised leave plan took effect, plaintiffs were ex-employees of USX and ex-members of the bargaining unit exclusively represented by USWA. Like retirees or those assuming nonunionized management positions, USWA argues that once plaintiffs terminated their employment relationship with USX, USWA's role as exclusive bargaining representative ceased and duty to fairly represent ended. As such, USWA contends that it owes plaintiffs no duty of fair representation.

Plaintiffs respond to USWA's contentions by asserting that the 1984 revised plan effectively reinstated them as employees of USX "on leave." Plaintiffs observe that employees on a leave of absence are presumed employees unless objective evidence exists that the employment relationship has been terminated. *See Valley Rock Prod., Inc. v. NLRB,* 590 F.2d 300, 303–04 (9th Cir.1979). Because USWA has presented no objective evidence that the employment relationship between USX and plaintiffs ended, plaintiffs assert this court must assume that their employee status continued.

Courts interpreting the meaning of "employee" under § 9 of the NLRA for the purpose of determining voter eligibility in union certification elections focus on whether the questioned individual possesses a "reasonable expectation of employment." *Montgomery Ward & Co. v. NLRB,* 668 F.2d 291, 298 (7th Cir.1981); *Choc–Ola Bottlers, Inc. v. NLRB,* 478 F.2d 461, 464 (7th Cir.1973). As explained in *Montgomery Ward:*

> The "reasonable expectation of employment" standard includes two elements that must be satisfied: ... a subjective element—the employee's intent or expectation—and an objective element—the reasonableness of the expectation.

*Montgomery Ward,* 668 F.2d at 298. Generally, an employee on a leave of absence is presumed to have requisite expectation of future employment. *Id.* at 299; *Trailmobile Division, Pullman, Inc. v. NLRB,* 379 F.2d 419, 423 (3d Cir.1967). This presumption attaches for the duration of the leave but evaporates if the employee does not return to work after the leave expires. *See Whiting Corp. v. NLRB,* 200 F.2d 43 (7th Cir.1952) (employee on illness leave who failed to return to work abandoned his employment). Workers who quit or abandon their jobs lose their status as employees because they no longer have the requisite expectation of future employment. *Id.; Montgomery Ward,* 668 F.2d at 299. In the absence of special circumstances establishing a contrary intention, a person who fails to resume his job after termination of leave abandons his employment. *See Whiting Corp., supra.*

This court believes the foregoing principles are relevant to the dispute at issue. Plaintiffs assert that their status as employees on leave was revived when the revised leave policy was adopted. Unfortunately, this assertion rests on the fault assumption that plaintiffs possessed an absolute right to participate in the extended leave program. As earlier discussed, USX possessed exclusive control over which union representatives participated in the re-

**702**

vised leave plan. As selection was purely at the discretion of USX and plaintiffs were never chosen as plan participants, plaintiffs cannot rely on the revised leave program to renew their status as employees on leave. Thus, plaintiffs' employment status must be analyzed in light of the leave policy in effect at the time each left USX for their USWA positions.

As previously noted by USWA, at the time each plaintiff left USX to assume a union position, leaves of no more than two years were available for full-time union work. The last plaintiff to leave USX did so in 1977 and broke service in early October 1979. At no time since leaving did any plaintiff attempt to return to his former position at USX. Thus, as of October 1979 all plaintiffs surrendered their status as employees on leave and lost the presumption of continued employment. Once the presumption is removed, the party asserting a person's continuing employee status carries the burden of establishing that the employee had a reasonable expectation of employment in the future. *See Montgomery Ward*, 668 F.2d at 300. Aside from the revised leave program, plaintiffs assert no facts which may establish that they possessed an expectation they would return to USX as employees or that such an expectation would be reasonable. To the contrary, the facts, as pled by plaintiffs, strongly suggest that plaintiffs abandoned their positions with USX when they failed to resume their employment after their two-year leave expired. Because plaintiffs fail to plead facts upon which a reasonable expectation of future employment can be based, plaintiffs are unable to establish that they continued to be members of the bargaining unit exclusively represented by USWA. As with others who have departed from USX with no reasonable expectation of returning, plaintiffs, as former employees, are not owed any duty of fair representation by USWA.

■ Plaintiffs nevertheless contend that even if they were former employees, the USWA owes them a duty of fair representation because "the rights under the [leave] policy relate back at least to the time of their active employment." This argument is misguided. The Supreme Court has consistently reaffirmed the principle that since former employees are not within the bargaining unit, the union owes them no duty of fair representation. *UMWA Health & Ret. Funds v. Robinson*, 455 U.S. 562, 574–575, 102 S.Ct. 1226, 1233, 71 L.Ed.2d 419 (1982) ("former members and their families may suffer from discrimination in collective-bargaining agreements because the union need not 'affirmatively ... represent [them] or ... take into account their interests in making bona fide economic decisions in behalf of those whom it does represent'") (*quoting Pittsburgh Plate Glass*, 404 U.S. at 181 n. 20, 92 S.Ct. at 398, n. 20); *Central States Pension Fund v. Central Transport*, 472 U.S. 559, 105 S.Ct. 2833, 86 L.Ed.2d 447 (1985) (union's duty does not extend to all fund participants but "is confined to current employees employed in the bargaining unit in which it has representation rights"). Unions are not required to enforce the pension rights of former employees, even though such rights were earned during a time when the employees were in the bargaining unit and represented by the union.

Next, plaintiffs argue that even if the union had no duty to represent them, "it could voluntarily undertake such representation," and once having volunteered, would be governed by the duty of fair representation. First, even if a union volunteers to represent a person outside the bargaining unit, it is not bound by the statutory duty of fair representation. *International Union, United Auto Workers v. Yard–Man*, 716 F.2d 1476 (6th Cir.1983). Second, plaintiffs' complaint is devoid of any allegation that USWA volunteered to represent plaintiffs. Instead, the complaint attacks the union because it would not represent plaintiffs. Although plaintiffs point to a letter sent by USWA President Williams to USX in response to the revocation of the extended leave plan, the letter does not contain any language indicating that USWA is pursuing extended pension benefits on plaintiffs' behalf. The document at issue simply informs USX that the USWA will enforce all leave rights

established in the agreements it negotiates —the two-year leave policy which appears in the current USWA–USX collective bargaining agreement. Moreover, the letter makes quite clear that the 1984 revised policy was USX's unilateral creation and thus not within its scope of responsibility.

Finally, plaintiffs argue that since the union "induced" them to leave their jobs at USX and forego earning additional USX pension benefits, USWA acquired a duty to represent plaintiffs in seeking pensions from their former employer. This argument, however, suffers from several deficiencies. Aside from the fact no authority exists for such a proposition, plaintiffs' complaint contains no trace of an allegation that USWA compelled plaintiffs to give up their employment with USX. Moreover, plaintiffs nowhere assert that USWA prevented them from returning to USX prior to expiration of their two-year leave. From all indications, plaintiffs on their own accord chose to leave USX, to accept employment with USWA, and to remain after termination of their two-year leave of absence knowing that their employment relationship with USX would thereby be severed. Because plaintiffs are unable to establish that USWA owed them a duty of fair representation, plaintiffs' claims against USWA fail, and Count VI of plaintiffs' complaint is dismissed.

### III. CONCLUSION

For the foregoing reasons, the motions of USX and USWA are granted, and plaintiffs' complaint is dismissed in its entirety.

IT IS SO ORDERED.