**COMMUNICATIONS WORKERS OF AMERICA, AFL–CIO, Plaintiff,**

v.

**BELL ATLANTIC NETWORK SERVICES, INC., et al., Defendants.**

**INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS, AFL–CIO, et al., Plaintiffs,**

v.

**NEW JERSEY BELL TELEPHONE COMPANY, et al., Defendants.**

Civ. A. Nos. 87–0455–OG, 87–0456–OG.

United States District Court, District of Columbia.

July 29, 1987.

Patrick M. Scanlon, John P. Counts and Larry D. Silver, Washington, D.C., for plaintiffs.

Bernard J. Casey, William Willcox, David L. Williams and Bernard M. Dworski, Washington, D.C., for defendants.

## MEMORANDUM

GASCH, District Judge.

### I. INTRODUCTION

This case concerns the continued viability of provisions in the collective bargaining agreements between the plaintiff unions and the defendant employers which permit employees to take unpaid leaves of absence for union business without losing certain "fringe" benefits provided to other employees. The precise question is whether the provisions affecting employees on union leave violate section 302 of the Labor Management Relations Act of 1947 ("LMRA"), 29 U.S.C. § 186 (1982 & Supp. III 1985).

### II. BACKGROUND

#### A. *Factual Setting*

In these consolidated cases,[1] the Communications Workers of America ("CWA") and the International Brotherhood of Electrical Workers ("IBEW") Local 827 and Local 1844 have brought identical actions alleging breaches of collective bargaining agreements and seeking declaratory and injunctive relief. Each of these plaintiff unions has a long-standing collective bargaining relationship with the various defendant employers, all wholly owned subsidiaries of Bell Atlantic Corporation.[2]

1. On April 13, 1987, the Court issued an order consolidating the two suits at bar. Plaintiffs in both actions have submitted joint briefs; defendants in both cases have done the same. On April 15, 1987, all parties filed a joint stipulation of facts.

2. The defendants in CWA's suit, Civil Action No. 87–0455, are Bell Atlantic Network Services, Inc., The Chesapeake and Potomac Telephone Company, The Chesapeake and Potomac Telephone Company of Maryland, The Chesapeake and Potomac Telephone Company of Virginia, The Chesapeake and Potomac Telephone Company of West Virginia, New Jersey Bell Tele-

Defendants admit that, as of August 1, 1987, they will cease to comply with certain collective bargaining agreement provisions concerning employees on union leave. Defendants alert the Court that at the time these provisions were negotiated, defendants believed the provisions to be lawful. However, in light of a recent opinion in the Third Circuit, *Trailways Lines, Inc. v. Trailways, Inc. Joint Council,* 785 F.2d 101 (3d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 403, 93 L.Ed.2d 356 (1986), defendants now conclude that benefits to employees on union leave are unlawful under section 302(a) of the LMRA.

The collective bargaining agreements between the plaintiff unions and the defendant employers contain generally similar provisions on leaves of absence for union business. Stipulation of Facts ("Stipulation") ¶ 7. Pursuant to the current agreements, the union may request a full-time leave of absence for an employee to perform union business. The employer will grant such a leave if service requirements permit the employee's absence from his or her job. Only a specified number of employees may be on leave for union business at any given time. The total cumulative period of union leave in a particular employee's career may not exceed eighteen years. Upon conclusion of the leave, the employee is entitled to reinstatement to his or her former job or to one substantially similar. Stipulation ¶ 7.

Employees on union leave are not paid by their employers. However, under the terms of the collective bargaining agreements, employees on union leave are provided with certain "fringe" benefits which the defendants now desire to discontinue. These benefits will be enumerated briefly. First, under the Bell Atlantic Pension Plan sponsored by defendant employers,[3] periods of union leave are not deducted from an employee's "term of employment." Stipulation ¶ 8. The greater an employee's "term of employment," the greater are his or her retirement benefits. Thus, an employee does not jeopardize future pension benefits by engaging in full-time union business.

Second, the collective bargaining agreements state that employees on union leave may receive death benefits, as established under the Bell Atlantic Pension Plan. Stipulation ¶ 8. Third, employees who anticipate an extended leave of absence, *e.g.,* those absent on union business, are permitted to purchase medical, dental and vision insurance coverage by paying premiums to defendant employers. These premiums are set at rates which reflect defendants' cost based on the experience of the entire employee group; these premiums are lower than those calculated on a non-group basis. Stipulation ¶ 8. Fourth, defendant employers provide employees on union leave with basic group life insurance at no cost to the employee. *Id.* Lastly, employees on leave for union business receive a discount on certain charges for their personal telephone services. This discount is given to all employees of the defendants. Stipulation ¶ 10.

As already stated, defendant employers will soon discontinue all of the above benefits provided to employees on union leave under the terms of current collective bargaining agreements.[4] These union leave benefits have been included in collective bargaining agreements between the parties for decades and, in some instances, since the late 1940's. Stipulation ¶¶ 2, 5. Plaintiff unions bring the instant actions seeking a declaratory judgment that the aforementioned union leave provisions are lawful and an order for defendants to comply with the provisions.

phone Company, The Bell Telephone Company of Pennsylvania, and The Diamond State Telephone Company. Defendants in IBEW's suit, Civil Action No. 87–0456, are New Jersey Bell Telephone Company and The Bell Telephone Company of Pennsylvania.

**3.** All defendant employers participate in the Bell Atlantic Pension Plan which provides benefits to bargaining unit employees. The Plan is administered by Bell Atlantic Corporation. Plaintiffs CWA and IBEW are not involved in the sponsorship or administration of the Plan.

**4.** All of the current collective bargaining agreements at issue were negotiated at arms-length and set for the term of August 1986 to August 1989. Stipulation ¶¶ 1, 3, 4, 6.

### B. *Statutory Framework*

Section 302(a) of the Labor Management Relations Act makes it a criminal violation for an employer to "pay, lend, or deliver ... any money or other thing of value ... to any representative of any of his employees ... or ... to any labor organization, or any officer or employee thereof, which represents ... any of the employees of such employer...." 29 U.S.C. § 186(a).[5] At the heart of the dispute before the Court is one exemption to this provision. Section 302(c)(1) provides the first exception to the criminal conduct described in section 302(a):

(c) Exceptions

The provisions of this section shall not be applicable (1) in respect to any money or other thing of value payable by an employer to any of his employees whose established duties include acting openly for such employer in matters of labor relations or personnel administration or to any representative of his employees, or to any officer or employee of a labor organization, who is also *an employee or former employee* of such employer, *as compensation for, or by reason of, his service as an employee* of such employer; ....

29 U.S.C. § 186(c)(1) (emphasis added). Plaintiffs argue that the fringe benefits that defendants have given, for decades, to employees on union leave are not subject to criminal sanctions but fall within the exemption for money given to "an employee or former employee" as "compensation for, or by reason of" his service to defendant employers.

### III. DISCUSSION

■ It is plaintiffs' contention that the actual language of section 301(c)(1) and the underlying purpose of the Labor Management Relations Act support the continued validity of the union leave benefits at stake. Plaintiffs' statutory analysis argument is fairly convincing. The plain language of the exemption states that an employer may give money to a former employee who currently works for a labor organization as long as this payment is in "compensation for, or by reason of" service rendered to the employer. *See* 29 U.S.C. § 186(c)(1). There is no dispute that employees on union leave may be classified either as "employees" or "former employees." Plaintiffs' Motion at 9; Defendants' Motion at 17. Defendants claim, however, that the fringe benefits given to employees are unlawful because they are not "compensation" or a *quid pro quo* for work performed for the employer. Defendants also dismiss the disjunctive phrase "or by reason of" in the statute as void of any significance. Defendants' Motion at 11 n. 5.

It would appear that defendants have misconstrued the plain language and the purpose of the Labor Management Relations Act. The statute does not define the pivotal phrase "as compensation for, or by reason of, his service as an employee" found in section 301(c)(1). It is therefore proper for the Court to interpret these words according to their ordinary meaning. *See Securities Industry Association v. Federal Reserve Board*, 468 U.S. 137, 149, 104 S.Ct. 2979, 2985–86, 82 L.Ed.2d 107 (1984). There is a strong argument that benefits which continue to be given to an employee on union leave are "compensatory." Each collective bargaining agreement that includes a union leave benefits provision reflects the fact that, in consideration for work performed, all employees have received the opportunity to take union leave without the loss of certain benefits.

Even if one reads "compensation" narrowly, it is evident that a continuation of benefits to an employee on union leave occurs "by reason of" that employee's service to defendant employers. This is so because, by definition, only employees who are on union leave from defendant employ-

---

**5.** Any person convicted of violating section 302(a) of the LMRA may be

guilty of a felony and be subject to a fine or not more than $15,000, or imprisoned for not more than five years, or both; but if the value of the amount of money or thing involved in any violation of the provisions of this section does not exceed $1,000, such person shall be guilty of a misdemeanor and be subject to a fine of not more than $10,000, or imprisoned for not more than one year, or both.

29 U.S.C. § 186(d)(1) (Supp. III 1985).

ers qualify for the "fringe" benefits here disputed. Other union officers or staff, who are not on leave from defendant employers, are not covered by the benefit plans. Therefore, those union representatives who are on temporary leaves of absence, and who have the right to be reinstated to their old job (or a similar one) with defendant employers, are receiving union leave benefits "by reason of" their former service and their future service to defendants.[6]

Defendants do not argue that union leave benefits are *not* provided "by reason of ... service as an employee." Rather, defendants simply deny that the statutory phrase has any particular significance. Defendants further suggest that the meaning of the phrase is the same as that for the words "as compensation for ... service as an employee." It is unlikely that Congress intended to be redundant. The fact that the phrases "as compensation for" and "by reason of" are cojoined by the disjunctive "or" usually indicates that the two phrases have different meanings. *See Garcia v. United States*, 469 U.S. 70, 73, 105 S.Ct. 479, 481, 83 L.Ed.2d 472 (1984) ("canons of construction indicate that terms connection in the disjunctive ... be given separate meanings."). Thus, contrary to defendants' urgings, the Court accords independent significance to the meaning of the phrase "or by reason of...."

Plaintiffs' reading of the Labor Management Relations Act, and the exemptions to its criminal provisions, is in line with the overall purpose of the statute. The purpose of the criminal violations set out in section 302 of the Act has been explained by the Supreme Court:

> Those members of Congress who supported the amendment were concerned with corruption of collective bargaining through bribery of employee representatives by employers, with extortion by employee representatives, and with the possible abuse by union officers of the power which they might achieve if welfare funds were left to their sole control.

*Arroyo v. United States*, 359 U.S. 419, 425–26, 79 S.Ct. 864, 868–69, 3 L.Ed.2d 915 (1959) (footnotes omitted). Senator Ball, a proponent of amending the LMRA to include section 302, stated that

> [T]he pending amendment deals with so-called welfare funds, which are becoming increasingly prominent in negotiations between unions and employers ... the sole purpose of the amendment is not to prohibit welfare funds, but to make sure that they are legitimate trust funds, used actually for the specified benefits to the employees of the employers who contribute to them, and that they shall not degenerate into bribes.

2 Legislative History of the Labor Management Relations Act of 1947 ("LMRA Leg. Hist.") 1304–05 (1948).

Thus, the purpose behind the statute was to prevent bribe-taking and "rackets" while preserving legitimate benefits to employees. *Id.* at 1305. The union leave benefits at issue in this case do not implicate a bribery or extortion scheme. The group benefits are provided by employer-administered plans and are in no sense controlled by union officers. Stipulation ¶ 8. The union leave benefit provisions were subject to ratification by the bargaining unit membership and were open to free negotiation between management and labor.

Defendants point to one remark by Senator Ball to support their view that to provide union leave benefits may violate the law since these benefits allegedly fall within the proscribed criminal conduct of section 302. Senator Ball gave a brief description of each section of the amendment, stating,

> Subsection (c) contains certain exceptions. The first one is with respect to any money due a representative who is an employee or a former employee of the

---

**6.** The Court notes, with respect to the IBEW union, the average period of employment preceding a leave of absence for union business was 20 years. *See* Perry Declaration ¶ 6. For the CWA union, the average pre-leave employment was 15 years. *See* Carroll Declaration ¶ 8. In the IBEW, the average period of time employees remained on union leave was 4.8 years. *See* Perry Declaration ¶ 4.

employer, on account of wages actually earned by him.

LMRA Leg. Hist. at 1304. This single remark tends to support defendants' theory that they may only give direct compensation or "wages earned" to employees on union leave. However, "even the contemporaneous remarks of a single legislator who sponsors a bill are not controlling in analyzing legislative history." *Consumer Products Safety Commission v. GTE Sylvania*, 447 U.S. 102, 118, 100 S.Ct. 2051, 2061, 64 L.Ed.2d 766 (1980).

The express language of the statute indicates that former employees performing union business may receive "money or other things[s] of value" from their employer "by reason of" the employee's service to the employer. The pension accrual, death payments, medical and life insurance benefits at issue here are not handed out to *any* union representative but only to defendants' former employees who, on the average, work 15 to 20 years before taking a leave of absence to perform union business. Senator Ball's single remark does not give full meaning to all of the language found in section 302(c)(1), namely, the statutory phrase "or by reason of." Moreover, it is logical to "start with the assumption that the legislative purpose is expressed by the ordinary meaning of the words used." *Richards v. United States*, 369 U.S. 1, 9, 82 S.Ct. 585, 591, 7 L.Ed.2d 492 (1962). Additional remarks by Senator Ball, as well as commentary by the Supreme Court, indicate that the employers' agreement to provide certain "fringe" benefits to employees on union leave does not contravene the actual language or purposes behind section 302 of the Labor Management Relations Act.

As stated earlier, union leave benefits have been included in collective bargaining agreements between the parties for many years, in some instances for three to four decades. These provisions have gone unchallenged until a recent decision in the Third Circuit, *Trailways Lines, Inc. v. Trailways, Inc. Joint Council*, 785 F.2d 101 (3d Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 403, 93 L.Ed.2d 356 (1986). In that case, the employer Trailways brought suit against the union alleging that an agreement provision requiring Trailways to make contributions to a joint union-management pension trust fund on behalf of employees on union leave was illegal under the LMRA. The District Court held for plaintiff employer, concluding that the recipients of the pension contributions were not present Trailways' employees and therefore could not fall within the section 302(c)(5) exemption for trust fund monies paid to "employees," *i.e.*, current employees. *Id.* at 104.

On appeal, a divided panel of the Third Circuit affirmed the District Court's decision. The appellate court, however, additionally reviewed a question not presented below, that of whether these pension fund payments to employees on union leave may be exempted under section 302(c)(1) regarding payments to employees or *former* employees. *Id.* at 104 n. 2. The majority summarily rejected the union's argument that section 301(c)(1) was applicable:

> Clearly, the statute contemplates payments to former employees for *past* services actually rendered by those former employees *while they were employees of the company*. Just as clearly, however, the pension fund benefits paid on behalf of former employees serving as union officials while on leave from Trailways are not compensation for their past service to Trailways.

*Id.* at 106 (emphasis in original; footnote omitted). In support of this conclusion, the majority emphasized the fact that pension fund contributions made on behalf of employees on union leave were measured by their current union positions. *Id.* at 106 n. 5.

At the outset, the Court notes several factual distinctions between the instant action and the *Trailways* case. First, the pension trust at issue in *Trailways* was administered jointly by labor and management. *Id.* at 103. Here, the Bell Atlantic Pension Plan is sponsored and administered solely by the employers, with no potential for union control. Second, the *Trailways* majority found it significant that pension contributions to employees on union leave

in that case were measured by the employees' current union position. In this case, an employee on union leave accrues benefits based on his or her *last job with the employer*. Finally, under the union leave system in *Trailways*, the employer was required to grant leave to any employee who accepted employment with the union and this leave was of indefinite duration. *Id.* at 103 n. 1. Here, the union leave is of limited duration and the defendant employers may deny a leave request if they need an employee's services.[7] Taken together, these distinctions indicate that the union leave benefits reviewed in *Trailways* edged closer to the potential for abuse and control by union officials while the union leave benefits in this case are considerably more removed from union influence.

There are, however, other reasons why this Court is not persuaded to follow the *Trailways* result. The *Trailways* majority in note 5 explained the rationale of their decision that pension benefits paid to former employees were not compensation for past services to Trailways. The explanation in note 5 is that "pension fund contributions made on behalf of former employees serving as full time union officials are measured by their salaries received in their *current union positions* thereby indicating that the pension fund contributions made on their behalf are geared to their *contemporaneous* services to the union." *Trailways, supra,* 785 F.2d at 106 n. 5 (emphasis in original). The majority's rationale and its decision are inapplicable to the facts in this case because here, as previously pointed out, the pension fund contributions made on behalf of these former employees are based on their last job with the employer. Furthermore, the statutory exemption of section 301(c)(1) that an employee of a labor organization who is also an employee or former employee of such employer allows a former employee to receive "thing[s] of value" from an employer "by reason of" the employee's services to the employer. The fact that the employees

bargained for inclusion of union leave benefits in their collective bargaining agreement, as they did for other forms of compensation, such as wages, overtime, insurance or accrued seniority, indicates that these benefits are "compensation for, or by reason of" work performed for defendant employers.

Furthermore, there is ample evidence that other courts have not viewed similar "bargained-for" terms of employment as violating the Labor Management Relations Act. Several circuits have upheld the legality of "no-docking" provisions in collective bargaining agreements, concluding that these provisions fall within the section 302(c)(1) exemption. Under a "no-docking" provision, union officers are entitled to take time off from work, with pay, to conduct union related business. In *BASF Wyandotte Corp. v. Local 227, International Chemical Workers Union,* 791 F.2d 1046 (2d Cir.1986), the Second Circuit held that a "no-docking" provision agreed upon by the parties did not violate the antibribery directives of the LMRA for this provision fell within the section 302(c)(1) exemption permitting employer payments to union officials where payment is made "by reason of" service as an employee. *Id.* at 1049. Although *BASF Wyandotte* involved a different type of agreement provision, the Court's reasoning and commentary on the section 301(c)(1) exemption is applicable to this case:

It appears that in using the alternative formulations "for" and "by reason of," Congress intended to cover two general categories of employee compensation: (1) wages, *i.e.*, sums paid to an employee specifically for the work he performs, and (2) compensation occasioned by the fact that the employee has performed or will perform work for the employer, but which is not payment directly for that work. The latter category would include such employee "fring" [sic] benefits as vacation pay, sick pay, paid leave for

---

7. Plaintiffs also note that, in *Trailways*, the employer's contributions to the pension trust were referenced to *individual* accounts. In contrast, the pension trust at issue in this case is based on

the aggregated characteristics of a *group* which includes approximately 51,000 active participants.

jury duty or military service, pension benefits, and the like.

. . . .

To the extent that fringe benefits consist of payments to an employee for any period of time in which he is not doing the employer's work, such as vacation, or sick time, or military leave, the activities engaged in are plainly not direct services to the employer. Thus, on sick leave, the employee seeks to recover his own health; on jury leave, he seeks to serve his community; on military leave, he seeks to serve his country. While indirectly the employer may be benefited, the employee's activity during these periods is not service to the employer. Yet BASF concedes that payment for these periods is plainly sanctioned by § 302(c)(1).

The common element with respect to all of these more commonly available fringe benefits is simply that the person to whom the employer makes payment is one who performs services as an employee. If he is an employee and is also a union official, an employer's payment to him, pursuant to a no-docking provision in a collective bargaining agreement, for time off to permit him to tend to union duties such as those listed above is not, in our view, different in kind from the employer's granting of such benefits as sick leave, military leave, or jury leave to its employees who are ill, military reservists, or prospective jurors. Just as jury leave is designed to permit the employee to serve his community, paid time off for the conduct of union business is designed to permit the union official to serve his fellow workers.

*Id.* at 1049 (footnote omitted).

The Fifth Circuit has reached the same result. In *N.L.R.B. v. BASF Wyandotte Corp.*, 798 F.2d 849 (5th Cir.1986), the Court also found that a "no-docking" provision was not illegal under the antibribery provision of the Labor Management Relations Act. The Court stated that section 302 was intended "to be a provision prohib-

iting bribery and company dominated unions, not prohibiting the kind of labor/management cooperation necessary to collective bargaining . . . ." *Id.* at 856.[8]

■ In the instant case, the benefits provided to employees on union leave fall within the second category delineated by the Second Circuit in *BASF Wyandotte;* the benefits are "compensation occasioned by the fact that the employee has performed or will perform work for the employer, but which is not payment directly for that work." 791 F.2d at 1049. The *Trailways* majority denied the applicability of the "no-docking" cases to union leave provisions because

[t]here is a sound distinction between payments made to a union official who goes on *temporary* leave to conduct union business and then returns to *active* employment, and payments on behalf of union officials who are on *full-time* leave but who may *never* return to full-time employment of his employer.

*Trailways*, 785 F.2d at 107 (emphasis in original). The distinction drawn by the majority in *Trailways* is not persuasive. In the case at bar, employees who take leaves of absence for union business with the IBEW leave for an average of 4.8 years. *See* Perry Declaration ¶ 4. Moreover, many employees on full-time union leave return to the active workforce because they were defeated in reelection campaigns for union office, terminated from union office, or voluntarily returned to the company. *See id.* "The distinction between using part of the day for union business and taking leaves of absence to become full-time union officials is only one of degree: the nature of the absences and the payments made by the employer during them (or measured by them) is the same." *Trailways*, 785 F.2d at 111 (dissent by Becker, J.).

### IV. CONCLUSION

The Court grants summary judgment in favor of plaintiff unions. The language

---

**8.** For other cases holding that "no-docking" provisions are not illegal under section 302, *see Employees' Independent Union v. Wyman Gor-* *don Co.,* 314 F.Supp. 458, 460–61 (N.D.Ill.1970); *United States v. Mottzell,* 199 F.Supp. 192, 197–98 (D.N.J.1961).

and history of the Labor Management Relations Act suggest that Congress did not intend to outlaw union leave benefits of the sort at issue in this case. The purpose of section 302 was limited to "prevent[ing] bribery, extortion, shakedowns, and other corrupt practices." H.R.Rep. No. 286, 91st Cong., 1st Sess. 1–2, *reported in* 1969 U.S. Code Cong. & Ad.News at 1159–60. The *Trailways* opinion is distinguishable. Its reasoning is not persuasive insofar as the facts of this case are concerned.

## ORDER

Upon consideration of the parties' cross-motions for summary judgment, the oppositions thereto, the argument of counsel in open court, and for the reasons stated in the accompanying memorandum, it is by the Court this 28th day of July, 1987,

ORDERED that plaintiffs' motion for summary judgment be, and hereby is, granted; and it is further

ORDERED that defendants' motion for summary judgment be, and hereby is, denied.