**Andrew TOTH, et al.,
Plaintiffs–Appellants,**

v.

**USX CORPORATION,
Defendant–Appellee.**

No. 88–2889.

United States Court of Appeals,
Seventh Circuit.

Argued April 12, 1989.

Decided Aug. 25, 1989.

Thomas H. Geoghegan, Despres, Schwartz & Geoghegan, Chicago, Ill., for plaintiffs-appellants.

Richard M. Stanton, Jacobs, Burns, Sugarman & Orlove, Chicago, Ill., S.G. Clark, Billy M. Tennant, Pittsburgh, Pa., Luanne Ellison, Chicago, Ill., F. A. Flowers, III, H. Graham Beene, Burr & Foreman, Birmingham, Ala., for defendant-appellee.

Michael H. Gottesman, Bredhoff & Kaiser, Washington, D.C., for amicus curiae.

Before WOOD, Jr., CUDAHY and KANNE, Circuit Judges.

CUDAHY, Circuit Judge.

In this case we are asked to decide whether the defendant, USX Corporation ("USX"), may institute a leave policy, refuse all but six applications under the policy and then rescind the policy without formally consulting their workers' union (in this case, the United Steelworkers of America, AFL–CIO–CLC ("USWA", the "Union")) or notifying other potentially eligible claimants. Fifteen former USX employees who were technically eligible under the new leave policy sue for monetary and equitable relief under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, and under the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 141 *et seq.*

USX argues that because its leave policy was illegal under the LMRA, the company did not violate ERISA by unilaterally revoking the policy. Plaintiffs, by contrast, argue that the leave policy did not violate the LMRA and that unilateral rescission was therefore unlawful under ERISA. They also assert that USX administered the policy in an arbitrary and discriminatory way—indeed, not even in accordance with the policy's own express terms (which the plaintiffs in any event viewed as discriminatory as well). Because the new leave of absence policy was allegedly adopted "by agreement with the USWA," the plaintiffs view the subsequent rescission as a breach of the company's agreement with a labor union in violation of the LMRA. The plaintiffs seek past benefits, damages, redress of fiduciary violations and a declaratory judgment that the LMRA does not prohibit the granting of the benefits at issue here.

Alternatively, plaintiffs argue that even if the leave policy did violate the LMRA, they are nonetheless entitled to relief on equitable grounds. They urge that they are not *in pari delicto* with USX, alleging that USX used the policy as a means of bribing a small number of union officials to agree to concessions in a contract negotiation. Accordingly, plaintiffs feel that USX should not be allowed to use its misdeed as a defense to this action.

I.

 Because we are reviewing the district court's dismissal of the plaintiffs' complaint, we will take all well-pleaded allegations as true, permitting dismissal only if the plaintiff could not prove any set of facts upon which relief might be granted. *Conley v. Gibson,* 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Rankow v. First Chicago Corp.,* 870 F.2d 356, 367–68 (7th Cir. 1989). As we have noted many times, the complaint merely serves to put the defendant on notice and is to be freely amended or constructively amended as the case develops, as long as amendments do not unfairly surprise or prejudice the defendant. *Ash v. Wallenmeyer,* 879 F.2d 272, 274 (7th Cir.1989); *Walton v. Jennings Community Hosp.,* 875 F.2d 1317, 1320–21 n. 3 (7th Cir.1989). Clearly, if we can see at this early stage in the development of the case that there exists a material issue of fact that would render the case unsuitable for summary judgment later on, we would certainly refuse to permit dismissal. Similarly, just as we would draw inferences in favor of the nonmoving party in reviewing a grant of summary judgment, we give the plaintiffs the benefit of the doubt in reviewing the dismissal of their complaint. This is important as to several disputed issues of fact in this case.

The plaintiffs' version of the facts, as described in the complaint, is roughly as follows: Prior to 1984, USX (through United States Steel Corporation, a division of USX) allowed its employees to continue accruing pension-benefit rights while they were on leave of absence from active employment for a period of up to two years. This policy applied, for example, to leaves of absence taken by employees in order to work for the Union. In 1984 USX changed its leave of absence policy, permitting former employees to accrue pension credit until retirement, whether they remained in the company's employ or left to work for

the union.[1] However, it imposed limits on this new policy:

such leave of absence shall be granted only to employees of United States Steel Corporation's current steel producing operations ... who (a) prior to January 1, 1978 left active employment with United States Steel Corporation in order to accept or continue employment with the International Union, (b) from the time of cessation of active employment until February 29, 1984 shall have continued in the active employment of the International Union and (c) shall continuously have held positions servicing bargaining units at the U.S. Steel Division in which [they] had been employed.

Complaint, Ex. A. Although this new policy was approved by the company in October of 1984, effective as of February 29, 1984, USX failed to inform the Union of its new policy until March 5, 1985; the *plaintiffs* were not informed about the existence of the policy until early 1987. (We note, however, that the company alleged at a meeting in September of 1987 that the new leave of absence policy was adopted by agreement with the Union—presumably meaning local representatives of the Union.) Prior to formally notifying the Union about the policy in 1985, USX approved benefits under the new policy for six Union employees, but has refused to apply the policy to any other applicants.[2] The complaint further alleges that USX has "waived in practice" any limits on its extended leave policy, because it has "granted benefits to others who did not qualify" under the stated conditions and has "engaged in arbitrary, discriminatory and disparate treatment of some plaintiffs, in violation of its fiduciary duties under ERISA section 404." Complaint, ¶ 47.

Shortly after plaintiffs applied for benefits under the new policy, USX rescinded the policy, asserting that recent opinions from the Third and Second Circuits had made it clear that the policy violated the LMRA. As of April, 1987, USX adopted a new policy, permitting pension credit to accrue only during leaves of absence of one year, renewable for "a further period of one year at the discretion of the Company." Complaint, Ex. B. The new policy permitted longer leaves only on the approval of the Corporate Policy Committee. The Union subsequently refused to represent the plaintiffs in their quest for benefits under the old policy.

In briefs filed in the district court and in this court, the plaintiffs have asserted one possible interpretation of the facts alleged in their brief—that the change in leave policy, applied as it was to a limited number of union officials, and kept secret from the Union itself as well as its members— was in effect a bribe of those officials.[3] The Union and USX make much of the fact that the "bribery scenario" was not itself spelled out in the complaint, but as we have

---

**1.** Specifically, the policy read:

A leave of absence shall be granted for the period between the date on which the employee left active employment with the United States Steel Corporation and the earliest of (i) the date of retirement from United States Steel Corporation, or (ii) the date employment with the United Steelworkers of America International Union terminates, with the proviso that such leave of absence which is creditable as continuous service shall be used for the purpose of determining eligibility for any type of pension under the 1980 Non–Contributory Pension Rules and any successor thereto other than a 30 year, 60/15 or deferred vested pension and to determine the amount of pension under said rules, except that the pension provided with respect to such service shall be determined solely on the minimum formula of the rules....

Complaint, Ex. A. Policies of this sort, permitting extended pension credit for employees that become union officials, have apparently been widespread in United States industry for decades. *See Communications Workers of Am. v. Bell Atl. Network Servs., Inc.,* 670 F.Supp. 416, 421 (D.D.C.1987).

**2.** There is one possible exception, mentioned in the complaint; a seventh USWA employee brought suit to collect benefits due under the terms of the new policy and was apparently granted them in return for settling the suit.

**3.** Plaintiffs point out in their brief that the company changed its leave policy shortly after the Union approved a new agreement whose terms were very favorable to the company—and that four of the six Union officials who were eventually given pension payments under the policy were the key Union negotiators of that agreement.

noted above, notice pleading does not require that every possible interpretation of the facts be spelled out in the complaint. Nor are the plaintiffs required at this point to prove their allegations as they would be on a motion for summary judgment; our inquiry here is not whether the plaintiffs win but rather whether there is any set of facts upon which the plaintiffs could *possibly* win. Thus, while we stress that the facts recited here have not been proved (and that the court of course does not take any position as to their ultimate truth), we will certainly consider, in connection with the motion to dismiss, the possibility that the facts here alleged amounted to a "sweetheart" deal. If under those facts the plaintiffs could conceivably prevail, then they should be permitted to continue past the motion to dismiss.

## II.

We proceed to the central questions: Was USX's rescinded leave policy in fact in violation of the LMRA—and even if it was, could USX be barred from raising an "illegality" defense if the company was not *in pari delicto* by reason of participation in a bribery scheme?

## A.

In rescinding its leave policy, the company took the position that any extended leave policy would violate the LMRA.[4] At issue are two provisions of section 302. Subsection (a) generally prohibits payments by employers to union officials:

(a) It shall be unlawful for any employer ... to pay, lend, or deliver, or agree to pay, lend, or deliver, any money or other thing of value—

(1) to any representative of any of his employees who are employed in any industry affecting commerce; or

(2) to any labor organization, or any officer or employee thereof, which repre-

sents, seeks to represent, or would admit to membership, any of the employees of such employer who are employed in an industry affecting commerce....

29 U.S.C. § 186(a). However, subsection (c) lists exceptions to this general prohibition, including the exception at issue here:

(c) The provisions of this section shall not be applicable

(1) in respect to any money or other thing of value payable by an employer to any of his employees whose established duties include *acting openly for* such employer in matters of labor relations or personnel administration or to any representative of his employees, or to any officer or employee of a labor organization, who is also an employee or former employee of such employer, as compensation for, or by reason of, his service as an employee of such employer....

29 U.S.C. § 186(c). It is fairly universally acknowledged that a central purpose of section 302 as a whole was to prevent employers from bribing union officials. *See* 93 Cong.Rec. 4805 (1947) (statement of Senator Ball, an author of Senate amendment substantially adopted as section 302 in final statute) ("The sole purpose of the amendment is not to prohibit welfare funds, but to make sure that they are legitimate trust funds, used actually for the specified benefits to the employees of the employers who contribute to them, and that they shall not degenerate into bribes."); *see also Arroyo v. United States,* 359 U.S. 419, 425–26, 79 S.Ct. 864, 868–69, 3 L.Ed.2d 915 (1959) ("members of Congress who supported the amendment were concerned with corruption of collective bargaining through bribery of employee representatives by employers [and] with extortion by employee representatives"); *BASF Wyandotte Corp. v. Local 227, Int'l Chem. Workers Union,* 791 F.2d 1046, 1050 (2d Cir.1986) (same); *Maxwell v.*

---

**4.** The company cited two cases in reaching this conclusion—*BASF Wyandotte Corp. v. Local 227, Int'l Chem. Workers Union,* 791 F.2d 1046 (2d Cir.1986), and *Trailways Lines v. Trailways, Inc. Joint Council,* 785 F.2d 101 (3d Cir.1986). While *Trailways* might support the company's conclusion, it is puzzling that the company cited *BASF*

*Wyandotte.* In *BASF Wyandotte,* the Second Circuit held that "no-docking" provisions (authorizing pay for time spent on union business) did not violate section 302, a holding that, if anything, tends to support the notion that leave policies of the sort involved in this case might be legal under the LMRA.

*Lucky Constr. Co., Inc.,* 710 F.2d 1395, 1398 (9th Cir.1983) ("congressional objective in enacting § 302 was to inhibit corrupt practices in the administration of employee welfare funds established through the collective bargaining process"); *Turner v. Local 302, Int'l Bhd. of Teamsters,* 604 F.2d 1219, 1227 (9th Cir.1979) ("dominant purpose of § 302 is to prevent employers from tampering with the loyalty of union officials and to prevent union officials from extorting tribute from employers"). The exceptions listed in subsection (c) have been carefully drafted with an eye to this underlying goal.

The plaintiffs make a quite creditable "plain language" argument based upon the exception delineated in section 302(c)(1), which permits payments by an employer "to any officer or employee of a labor organization, who is also an employee or *former employee* of such employer, as compensation for, or *by reason of,* his service as an employee of such employer." (emphasis supplied). The plaintiffs are union officials who were once employed by USX. The new leave policy arguably provided extended leaves for former employees "by reason of" their earlier service, as can be seen in the company's stated basis for the new policy:

> Under the [former] Leave of Absence Policy, bargaining unit employees who accept full time employment with the union are limited to a one-year leave of absence which may be extended for one additional year before service breaks. Consequently, many of these former employees never attain eligibility for a USS pension. Labor Relations is of the opinion that it is in the Company interest that United Steelworkers of America International Union (USW) representatives with whom they deal be familiar with the United States Steel facilities they represent. It is felt that there is a distinct advantage to be dealing with International representatives who were formerly employed by United States Steel concerning potential problems and/or grievances and implementation of the various collective bargaining agreements. Thus it is in the Company's interest to foster and promote the goodwill of former employees who were granted leaves of absence to work for USW.

> Therefore, it is proposed that the Leave of Absence Policy be revised to permit granting leaves of absence beyond two years....

Complaint, Ex. A. In adopting the policy, the company would arguably be providing for extended leave "by reason of" a former employee's earlier service, which rendered that employee familiar with the facilities and particular situations of specific company plants. Alternatively, as plaintiffs' brief argues, the policy could be viewed as "a 'good will' payment, in recognition of plaintiffs' past employment for USX, and its purpose is to compensate, or make whole. It is a true commercial payment...." Brief of Plaintiffs–Appellants at 28. Of course, characterizing the payment as a "good will" payment brings it perilously close to the kind of payment Congress sought to prohibit in section 302 —but at this stage of the proceedings we can grant the plaintiffs that payments of this sort, if given "by reason of" employees' former employment with the company and administered in an above-board, non-coercive manner, could fall within the plain language of the 302(c) exception.

In *Trailways Lines, Inc. v. Trailways, Inc. Joint Council,* 785 F.2d 101 (3d Cir. 1986), the Third Circuit confronted a very similar "plain language" argument from the union in that case, but came up with a somewhat different reading of the language of 302(c)(1):

> A logical reading of the statute makes clear that the "payments to former employees' exemption" of 302(c)(1) applies solely to payments made as "compensation for or by reason of" the former employees['] *past* service to the employer.... Clearly, the statute contemplates payments to former employees for *past* services actually rendered by those former employees *while they were employees of the company.* Just as clearly, however, ... pension fund benefits paid on behalf of former employees serving as union officials while on leave from

**1302**

Trailways are not compensation for their past service to Trailways.

*Id.* at 106 (emphasis in original). *Trailways* involved a collective bargaining agreement provision requiring Trailways to contribute to a joint union-management pension trust fund for employees who took leaves of absence from the company to accept full-time union positions. In concluding that this arrangement did not fall under the 302(c)(1) exception, the Third Circuit took as obvious two propositions— first, that the word "services" in the statute really means "past services," and second, that any compensation continuing beyond the time of an employee's "past" employment could not be "by reason of" employment. The first proposition is fairly clearly correct; the statute speaks of compensating employees or former employees for "service as an employee of such employer." In the case of a former employee, this service would have to have been completed "as an employee"—i.e., in the past, while he or she was still employed by the employer. The second proposition, however, does not follow in any obvious fashion from the "plain language" of the statutory phrase "by reason of."

The district court in the case before us appears to have accepted the Third Circuit's reading—and additionally found two further reasons why the leave plan in this case would not qualify under the section 302(c)(1) exception. First, the court attempted to distinguish a recent Second Circuit opinion, *BASF Wyandotte Corp. v. Local 227, Int'l Chem. Workers Union,* 791 F.2d 1046 (2d Cir.1986), which held that "no-docking" provisions fall under the section 302(c)(1) exception. "No-docking" provisions permit employees to spend time during the workday on union business without losing pay for those periods of time. The district court viewed "no-docking" provi-

sions as different from the leave provision at issue here because payments to employees under the "no-docking" principle benefit *current* employees. *Toth v. USX Corp.,* 693 F.Supp. 693, 698 (N.D.Ill.1988) ("the § 302(c)(1) exemption applies to payments made to, or on behalf of, present employees of the paying company"). However, as we have noted, section 302(c)(1) on its face provides for payments to *former* employees, so that this distinction does not seem sufficient to distinguish the "no-docking" cases.[5] Thus the fact that USX's leave policy applies to former employees does not mean that section 302(c)(1) is inapplicable.

Second, the district court viewed as critical to its finding of illegality the discretionary nature of the leave plan in the case before us: "Unlike the plans at issue in *Trailways* or *Bell Atlantic,*[6] participation in the USX extended leave program is completely discretionary." *Id.* at 698. Again we respectfully disagree with the reasoning of the district court, for whether or not the USX plan was discretionary is a disputed issue of fact not suitable for disposition at this stage in the case. The language of the plan itself is not discretionary at all; it states in mandatory language that leaves of absence *"shall"* be granted to employees who meet the delineated criteria. However, the letter in which USX informed the Union about the changed leave policy characterized the leave policy as entirely discretionary:

... please be advised that, effective February 29, 1984, United States Steel's procedure was revised so that Leaves of Absence applied for by International Union Representatives may be permitted for longer periods than those established in the Labor Agreement, in designated circumstances, at the discretion of the Company on a case-by-case basis. Pur-

---
**5.** The court in *Trailways* was also asked to decide the applicability of section 302(c)(5), an issue not raised in the case before us. The 302(c)(5) exception permits employers to make payments to pension funds for "employees", but unlike section 302(c)(1) does not specifically include "former employees" as well. The Third Circuit understandably concluded that the term

"employees" in section 302(c)(5) meant *current* employees only. 785 F.2d at 106–08.

**6.** The court here refers to *Communications Workers of America v. Bell Atlantic Network Services, Inc.,* 670 F.Supp. 416 (D.D.C.1987), in which the District Court for the District of Columbia held that a long-term leave policy qualified under the section 302(c)(1) exception.

suant to the above policy, we have approved requests for Leaves for six (6) International Union Representatives.... Plaintiffs' Memo. in Opp. to Motion to Dismiss, Ex. 2. What effect the language in the letter should have on the terms of the policy—and indeed the proper interpretation of the policy—are issues that are hotly disputed. We agree with the district court that plans that are entirely discretionary would be difficult to exempt from the general prohibition of section 302(a), precisely because they would afford too large an opening for precisely the kind of seduction of union representatives that section 302 was designed to avoid. A reading of the phrase "by reason of" that would permit such entirely discretionary plans might permit the exception to swallow the rule. But we do not reach the difficult question of how much discretion in the employer is permissible under section 302 because it is not open to us to decide on disputed issues at this stage—and because other issues determine the outcome here.

We are left, then, to consider the reasoning of the Third Circuit as adopted by the district court. The Third Circuit ruled that

"the statute contemplates payments to former employees for *past* services actually rendered by those former employees *while they were employees of the company*" and that "pension fund benefits paid on behalf of former employees serving as union officials while on leave from Trailways [clearly] are not compensation for their past service to Trailways." 785 F.2d at 106 (emphasis in original).[7] Granting that the word "services" in section 302(c)(1) signifies "past services" only, there remains a further question why compensation continuing beyond the time of an employee's "past" employment could not still be "by reason of" that past employment. We cannot find any signal in the text itself, nor in the legislative history of the text, to justify the Third Circuit's restrictive reading of the language of section 302(c)(1).[8] Indeed, inclusion of the term "former employee" within the section would seem to indicate, to the contrary, that payments could be made at any time after employment ceased, as long as they were given "as compensation for, or by reason of" the earlier service. However, given the overall purpose of section 302 (to prevent bribery), we may

---

**7.** The Third Circuit further noted that in the particular plan at issue in that case, pension fund contributions on behalf of former employees were measured by their current union salaries rather than by any past position with the company. 785 F.2d at 106 n. 5. This is a somewhat different point, for it would obviously be possible to have continuing pension contributions for former employees that were measured by past positions with the company. *See, e.g., Bell Atlantic,* 670 F.Supp. at 422. But the reasoning in *Trailways* would seem to bar even continuing pension contributions measured by past wages: "Since it is undisputed that the individuals involved perform *no present* services for Trailways for which they could be compensated while on leave to serve the Union, ... it is [ ] evident that the contributions to the pension fund are not in compensation for, or by reason of, the employees' current service to Trailways." 785 F.2d at 106 n. 5. Thus, *Trailways* reads an extra provision into the language of section 302(c)(1), assuming that payments made as "compensation for or by reason of" past services cannot be made after the time those services cease. This is clearly not a "plain language" reading of the statute.

**8.** Although it is not directly on point, our recent opinion in *Tyson v. International Brotherhood of*

*Teamsters, Local 710* lends strong support to the proposition that retroactive payments can properly be deemed compensation for earlier service, even where they are not straightforward wages for labor. 811 F.2d 1145, 1147 (7th Cir. 1987) (under terms of collective bargaining and trust agreements, employee is "entitled to pension credit for certain hours that he does not actually work, even if, as here, he is paid for those hours after he has ceased to be employed"). *Tyson* further notes that severance pay, or payments to disabled employees, may properly be deemed "payments made in recognition of long years of work"—presumably, then, these payments would be made "by reason of" former employment.

The one statement specifically discussing subsection (c)(1) made by Senator Ball, an author of section 302, does not give much enlightenment: "The first [exception] is with respect to any money due a representative who is an employee or a former employee of the employer, on account of wages actually earned by him." 93 Cong. Rec. 4805 (1947). We are still left here to construe the words "on account of," which pose much the same difficulty as is posed by the words "by reason of." Obviously, where there is little guidance from the legislative history, we concentrate upon construing the language of the statute rather than that of the legislative history.

not construe the phrase "as compensation for, or by reason of" too broadly. We are left with a tension between the general prohibition of section 302(a), with its clear goal of preventing bribery, and the specific exception of section 302(c)(1), permitting payments to former employees as long as those payments are in some way motivated by past services.

One obvious instance in which continuing payments constitute recompense for past services is when those continuing payments were bargained for and formed part of a collective bargaining agreement. As Judge Becker remarked in dissent in *Trailways,* all of the terms of employment for which unions bargain are properly deemed part of the compensation for which employees work. 785 F.2d at 109. This is also a point stressed by Judge Gasch of the United States District Court, District of Columbia, who in *Communications Workers of America v. Bell Atlantic Network Services, Inc.* ruled that benefits granted employees who were on union leaves (for up to eighteen years) were acceptable under the section 302(c)(1) exception. 670 F.Supp. 416, 419 (D.D.C.1987) ("Each collective bargaining agreement that includes a union leave benefits provision reflects the fact that, in consideration for work performed, all employees have received the opportunity to take union leave without the loss of certain benefits."); *see also BASF Wyandotte Corp.,* 791 F.2d at 1049. Employees might accept lower wages now in return for future benefits; the work they subsequently perform is as surely performed in order to earn those future benefits as it is to earn current wages. In those cases future benefits would be "in compensation for" or "by reason of" past employment. Thus, collective bargaining and inclusion in a generally disseminated collective bargaining agreement, whose terms are uniformly applicable and nondiscriminatory, are crucial. In addition, requiring that such compensation be openly bargained for and included in a collective bargaining agreement is one way in which to guard against use of retroactive payments to bribe union officials. And, if inclusion in a collective bargaining agreement is required, the officials

would have to answer to the rank-and-file about any term of the agreement aimed at compensating the officials.

If retroactive payments were openly bargained for, labor and management would also be permitted to arrive at a mutually satisfactory solution to the problem of pensions and pension credit for employees who typically move back and forth between work for the company and work for the unions. This would accord well with observations contained in the legislative history of the LMRA, which demonstrate that Congress was attempting to permit labor and management some leeway in negotiating joint solutions to such problems while guarding against potential collusion between employers and corrupt union officials. One example is the struggle over how to handle employer aid to union welfare funds. This was completely banned in the original version of the bill. *See* H.R. Rep. No. 245, 80th Cong., 1st Sess. 29 (1947) [House Report]; S.Rep. No. 105, 80th Cong., 1st Sess. 426–30 (1947) [Senate Report] (containing no exception for welfare funds). The minority report from the House stressed the undesirable nature of a complete ban:

> Provisions which deny employees and organizations the opportunity to make voluntary provisions against illness and insecurity can only increase reliance upon the State. In the interest of sound governmental policy such dependence upon the State should be checked by encouraging the formulation and adoption, through voluntary agreement, of plans that will aid citizens during periods of misfortune or economic distress. Legal prohibitions against such arrangements increase the responsibility of the Federal Government to its citizens in periods of distress.

House Report [Minority Report] at 79. In the Senate, a number of senators, including Senators Ball and Taft, issued Supplemental Views stating their intention to propose a number of amendments—including one that was eventually to become section 302. Senate Report [Supplemental Views] at 458–59; *see also* 94 Cong.Rec. 4754 (Senate

adopts amendment); H.R.Rep. 510, 80th Cong., 1st Sess. 24–25, U.S.Code Cong. Serv. 1947, p. 1135 (Conference Committee accepts amendment). The authors of the Supplemental Views stated that their proposal "does not prohibit welfare funds but merely requires that, if agreed upon, such funds be jointly administered" and reiterated their aim of safeguarding union members' money, rendering union officials strictly accountable for the use of that money and preventing "extortion." *Id.* Their approach demonstrates the balancing of interests in the course of solving the problem; funds were to be permitted, not banned, but safeguards were put in place to ensure that union members' interests were sufficiently protected.[9] A similar balance can be achieved under the provisions of section 302(c)(1) by permitting unions and employers to work out a joint solution to the pension credit problem while still requiring accountability to the membership and a firm connection between credit given and the terms of prior employment.

At some point, it is conceivable that a bargain struck by the union and the employer might yet violate section 302—if, for example, the terms of compensation for former employment were clearly so incommensurate with that former employment as not to qualify as payments "in compensation for or by reason of" that employment, or if the terms vested so much discretion in the employer that the potential for undue influence created a clear 302(a) violation. *See BASF Wyandotte,* 791 F.2d at 1050 ("we do not suggest that [section 302(c)(1)]

would allow an employer simply to put a union official on its payroll while assigning him no work ... this would be precisely the kind of device that §§ 302(a) and (b) were designed to prevent"; fulltime pay for no service cannot reasonably be said to be compensation "by reason of" service as an employee). But policies that simply provide continuing pension credit for union members such as those involved in the case before us, or in *Trailways,* do not by themselves constitute such dangerously imbalanced bargains.

Nonetheless, the company's policy in the case before us cannot qualify as "compensation for or by reason of" former employment because, unlike the policy in *Trailways,* USX's leave policy was not a part of the bargained-for collective bargaining agreement.[10] It was a unilateral change— under the plaintiffs' own allegations, a bribe. That the change here was at least conducive to or suggestive of bribery (whatever the merits of the bribery contentions) should indicate why it is not suitable for exemption from the general section 302 prohibition on gifts or loans from employers. Allowing more former employees to "get in" on the bribe would hardly further the purposes of section 302. The proper remedy for the situation if bribery was indeed involved is prosecution of the company and union officials at fault, not judicial approval of the bribery scheme. *Cf. Arroyo v. United States,* 359 U.S. 419, 424–25, 79 S.Ct. 864, 867–68, 3 L.Ed.2d 915 (1959). We note additionally that, of course, if the company felt that its policy

**9.** *See* section 302(c)(5), which provides:
(c) The provisions of this section shall not be applicable
(5) with respect to money or other thing of value paid to a trust fund established by such representative, for the sole and exclusive benefit of the employees of such employer, and their families and dependents ... *Provided,* That (A) such payments are held in trust for the purpose of paying, either from principal or income or both, for the benefit of employees, their families and dependents, for medical and hospital care, pensions on retirement or death of employees ... (B) the detailed basis on which such payments are to be made is specified in a written agreement with the employer, and employees and employers are equally represented in the administration of such fund, ... and (C) such payments as are

intended to be used for the purpose of providing pensions or annuities for employees are made to a separate trust which provides that the funds held therein cannot be used for any purpose other than paying such pensions or annuities....
As the Second Circuit noted in *BASF Wyandotte,* 791 F.2d at 1051–53, the legislative history of a related provision of the NLRA (and of subsequent amendments) exhibits a similar attempt to prevent corruption while still permitting unions and companies some freedom to jointly solve shared problems.

**10.** Because of this crucial distinction, the case before us is distinguishable from *Trailways,* and our holding therefore does not directly conflict with that of the Third Circuit.

violated the LMRA, it should also have recognized that any further payments of any kind under the policy would be illegal—including those to the six or seven former employees to whom the company saw fit to extend this special benefit.

We note an additional problem with the arrangement in this case; the new policy was instituted retroactively (another potential distinction between the case before us and *Trailways*). Although section 302 does not by its terms forbid retroactive *payments* in consideration for former service, it is not clear whether retroactive institution of new terms of employment would be permissible under section 302. The problem, of course, is that if a new pension policy is negotiated after a former employee has broken service, it is not obvious that the new policy is compensation for prior service. On the other hand, it may still be "by reason of" prior service within the terms of the statute. *See Bell Atlantic*, 670 F.Supp. at 419–20. We do not reach this issue; it suffices for our purposes that the policy in this case was not part of a collective bargaining agreement. We leave to another day the question whether retroactive bargaining is permissible.

### B.

■ Plaintiffs argue alternatively that even if the leave policy in this case violated the LMRA, we should enforce it because they are not *in pari delicto* with USX. Essentially, the plaintiffs contend that the new leave policy was instituted in order to bribe union officials to make concessions when bargaining with the company; thus the company should not be permitted to raise illegality of the contract as a defense here, particularly in light of the fact that the plaintiffs were wholly innocent of any misdeeds.

However, as the district court pointed out, we have firm guidance from the Supreme Court on this issue. In *Kaiser Steel Corp. v. Mullins*, 455 U.S. 72, 102 S.Ct. 851, 70 L.Ed.2d 833 (1982), the defendant corporation attempted to raise an illegality defense when trustees of a union pension fund sued for payments due under the terms of the collective bargaining agreement. The defendant argued that the specific contractual provision upon which the trustees relied was illegal both under the National Labor Relations Act ("NLRA") and the Sherman Act. The United States Court of Appeals for the District of Columbia Circuit refused to allow the illegality defense on a number of grounds, including "considerations of equity and relative fault." *Mullins v. Kaiser Steel Corp.*, 642 F.2d 1302, 1311 (D.C.Cir.1980). The Court of Appeals specifically invoked the *in pari delicto* doctrine, noting that the trustees in that case served as representatives of "persons wholly innocent of wrongdoing." *Id.* The appellate court also considered "the overall scheme of national labor policy" in refusing to permit an illegality defense based upon the NLRA. The Supreme Court rejected the reasoning of the appellate court and held that the federal courts could not enforce promises that themselves violated the labor or antitrust laws. 455 U.S. at 82–83, 102 S.Ct. at 859.

It may be, as plaintiffs argue, that *Kaiser* has not entirely foreclosed an *in pari delicto* argument under some circumstances. *See id.* at 81–83 & n. 7, 102 S.Ct. at 858–859 & n. 7. But the situation in this case is directly analogous to that in *Kaiser*, and if wholly innocent pension trustees were not entitled to enforcement of a contract that arguably violated the NLRA, neither can plaintiffs in the case before us require enforcement of a company leave policy that violates the LMRA. As we have noted, enforcing an illegal promise in order to benefit third parties is not an appropriate way of punishing any wrongdoing that may have occurred.

### III.

The leave policy at issue here was illegal, not because it provided for a long term arrangement, but because it was not properly bargained for and included as a term of the collective bargaining agreement between the company and the Union. Because the plaintiffs cannot avail themselves

of an *in pari delicto* argument in this case, the judgment of the district court is

AFFIRMED.